[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-14473
_____

D.C. Docket No. 2:10-cr-00010-RWS-SSC-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARTURO CARILLO-AYALA,

Defendant-Appellant.
_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(March 22, 2013)

Before TJOFLAT and COX, Circuit Judges, and MOLLOY,[*] District Judge.

MOLLOY, District Judge:

This case presents an issue of first impression in this Court concerning the

"safety valve," but one the trial judge noted is an all too frequent conundrum for a

_____

[*] Honorable Donald W. Molloy, United States District Judge for the District of Montana, sitting by designation.

sentencing judge.  When a defendant stands convicted of a drug offense carrying mandatory minimum terms of imprisonment and supervised release, the sentencing judge may impose a sentence below the otherwise mandatory minimum terms if the defendant meets five criteria.  18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2.  Only one of the five criteria is relevant here.  It requires the defendant to show that he "did not . . . possess a firearm . . . in connection with the offense."  18 U.S.C. § 3553(f)(2); U.S.S.G. § 5C1.2(a)(2).

Defendant Arturo Carillo-Ayala admits he was a drug dealer and admits he sold firearms, but his ostensible business plan was "Guns and Drugs Sold Separately."  The question before us is whether a drug-dealer who also sells firearms to a drug customer possesses those firearms "in connection with" the charged drug offense.  The answer is "not necessarily."

## I. Background

Carillo-Ayala, with three co-defendants, was named in two counts of a ten-count indictment alleging various drug and weapons offenses.  Carillo-Ayala ("Carillo") was charged with one count of conspiring to possess with intent to distribute a substance containing at least five grams of methamphetamine, a violation of 21 U.S.C. §§ 846 and 841(a)(1) (Count 1); and one count of being an illegal alien in possession of a firearm, a violation of 18 U.S.C. § 922(g)(5) (Count

2

10). He pled guilty to both counts without a plea agreement. On Count 1, he faced a mandatory minimum sentence of five years. 21 U.S.C. § 841(b)(1)(B)(viii).

## A. Facts

The United States Probation Office prepared a presentence report. The cast of characters involved the defendant and two others. Without objection from either party, the probation officer described the pertinent conduct as follows. Through a confidential informant, co-conspirator Domingo Adame-Najera ("Adame") met an undercover agent ("Jones," a pseudonym) on July 21, 2009. Jones expressed interest in purchasing firearms. Adame and Jones engaged in a series of sales, involving rifles, shotguns, handguns, ammunition, and the repeated promise of assault rifles. Jones frequently followed Adame to other locations to obtain the weapons.

On July 30, 2009, in the midst of another of their bargaining sessions about guns, Adame asked Jones whether he would like to purchase three ounces of heroin. Jones asked whether methamphetamine was available. Adame replied that it was, but it was not good quality. He added that he could get "good stuff" from Mexico. Jones reverted to the heroin and offered to follow Adame to the location where it was available. Adame balked at that proposal, just as he did at taking Jones to the location of an AK-47 the two had discussed. But they completed

3

another firearms sale at a neutral site. Although Jones reiterated his interest in the heroin, Adame told him it had "sat" for a long time and "did not look right."

Over the next two months, Jones continued to buy firearms, heroin, and high-grade methamphetamine from Adame and another co-conspirator, Marcos Armendariz. At one point, Adame asked Jones why he "wanted all these guns." In his answer, Jones said that "he had friends 'over there,' who used them, and stated he would be traveling for a couple of weeks to California and near 'the line' (Mexico)." Adame at some point told Jones that "his supplier" wanted to meet him "to assure himself" that Jones "could be trusted." "Trust" was a frequent topic of conversation between Adame and Jones. They also talked about sales of dynamite, blasting caps, hand grenades, and assault rifles, but none of these ideas reached fruition.

On September 27, 2009, Adame, who was working in Alabama and planning to move to Las Vegas, introduced Carillo to Jones. Jones asked Carillo whether he was the heroin supplier. Carillo said he was. The three men visited about drug prices and firearms but completed no sales that day.

On September 30, Carillo called Jones to talk about methamphetamine and gun purchases, and they agreed to meet the next day. On October 1, Carillo asked Jones if he would be interested in a machine gun. Jones confirmed his interest.

4

When they met, however, Carillo didn't bring either the machine gun or the methamphetamine to the foray. Instead, he sold Jones a revolver. The two men talked over blasting caps and dynamite, and then arranged another meeting to complete a methamphetamine deal.

On October 6, 2009, Carillo called Jones and offered to sell him five assault rifles at $650 each. They haggled and then Jones counter-offered $550 for the guns. Carillo said he would talk to the owners and call Jones back. On October 11, 2009, Jones and Carillo once again tossed around firearm prices and quantities of methamphetamine and agreed to meet on October 14, 2009. On that day, Carillo sold Jones a rifle, a shotgun, and 58.6 grams of methamphetamine, divided among three baggies.

On October 27, 2009, Carillo again touched base with Jones, saying he still had three assault rifles for sale. Jones expressed interest and asked about heroin, as well. Carillo responded that he had a small quantity but could not quote a price. He also said each rifle was still priced at $650. They did not come to terms, so no agreement was reached. The relationship ended at this point.

### B. Offense Level

For purposes of calculating the base offense level,[1] the quantities of

---

[1] Count 10 was subsumed by Count 1 under U.S.S.G. § 3D1.2(c), because possession of

5

methamphetamine and heroin Carillo sold to Jones were converted into their respective marijuana-equivalents.  U.S.S.G. § 2D1.1 cmt. n.10(B), (D).  Carillo was held responsible for a total of 117.2 kilograms of marijuana, corresponding to a base offense level of 26.  U.S.S.G. § 2D1.1(c)(7).  The district court properly concluded that a two-point upward adjustment in the guideline calculation was warranted because "a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1).  Consequently, Carillo's adjusted offense level was 28. He secured a three-point reduction for acceptance of responsibility, U.S.S.G. § 3E1.1, leading to a total offense level of 25.  With a criminal history category of I, his advisory Guideline range was 57-71 months.  But, under 21 U.S.C. § 841(b)(1)(B)(viii), he faced a statutory mandatory minimum of five years because of the amount of methamphetamine he sold to Jones.[2]

Carillo did not object to the two-point enhancement under U.S.S.G. § 2D1.1(b).[3]  Even so, he did argue that he qualified for the safety valve.  He insisted that, although he possessed a firearm, there was no "connection," § 5C1.2(a)(2), between his sales of methamphetamine and heroin, on the one hand, and his discrete sales of firearms, on the other.  He claims he could have accomplished

a firearm was a specific offense characteristic pertinent to Count 1, and the guideline calculation under Count 1 was higher than under Count 10, *id.* § 3D1.3(a).  Count 10 and Carillo's status as an illegal alien have no further relevance in the discussion.

[2]  If 21 U.S.C. § 841(b)(1)(A)(viii) applied, the government did not pursue it.

[3]  Subsequent references to the United States Sentencing Guidelines give only the section.

6

either sale without the other; in fact, he did exactly that on October 1, 2009, when he sold Jones two firearms but no drugs.[4]

The United States argued, in both the district court and on appeal, that the safety valve did not apply because Carillo's possession of firearms was "relevant conduct." It also argues that, because there was an instance when firearms were "there present with the drug transaction," the safety valve could not apply.

The district court recognized there was something to Carillo's premise that simply possessing firearms, or even selling firearms, did not establish a connection with his drug conviction. But the judge also expressed frustration with the multiplicity of standards applying to a drug defendant's possession of a firearm:

> [T]his firearm enhancement is one that causes me more problems than probably any other one in the guidelines. It's just, it's all over the board. It's everything from "present" to "in furtherance of" to "in connection with," and I'm not sure they make a whole lot of clear distinctions about that. I would certainly recommend to the Sentencing Commission that this could be cleaned up a whole lot if they wanted to make it easier for judges who actually have to make decisions on these things.

But, having expressed his exasperation, the district court looked to the events of October 14, 2009 – when Carillo sold Jones a rifle, a shotgun, and three baggies of methamphetamine – as "the key," "an instance where what is

---

[4] The presentence report noted that Carillo had not debriefed with the case agents and so had not met the fifth criterion. But sentencing proceeded on the assumption that Carillo would qualify if he met the second criterion. We assume that Carillo met or would be deemed to have met all the other criteria.

7

contemplated . . . does come into play and preclude him from getting the safety valve." The judge then considered the factors in 18 U.S.C. § 3553(a), and sentenced Carillo to a mandatory minimum of 60 months in prison on Count 1, concurrently with 60 months on Count 10 of the Indictment, to be followed by five years' supervised release.

We are now asked to decide whether the thoughtful reasoning of the district judge was error when the court found a "connection" between Carillo's possession of firearms and the drug offense of which he was convicted.

## II. Analysis

We review a district court's factual findings under the Sentencing Guidelines for clear error. *United States v. Cruz*, 106 F.3d 1553, 1557 (11th Cir. 1997); 18 U.S.C. § 3742(e). The district court's legal interpretation of statutes and Sentencing Guidelines is reviewed *de novo*. *United States v. Williams*, 340 F.3d 1231, 1238-39 (11th Cir. 2003). Here, we articulate a "legal standard or principle" for district courts to apply in determining whether a defendant possessed a firearm in connection with a drug offense under § 5C1.2(a)(2), but we generally review a district court's application of the standard to "a detailed fact pattern" for clear error. *Id.* at 1239.

### A. The Safety Valve

8

Mandatory minimum terms of imprisonment and supervised release are triggered by certain quantities of drugs and can be increased where the defendant has a history of committing similar offenses or where serious injury or death result. *See, e.g.*, 21 U.S.C. § 841(b)(1)(A). While a mandatory minimum sentence is usually preclusive, sentencing under the Guidelines is also based in large part on individual factors such as whether the defendant played a limited or extensive role in the offense, § 3B1.2, whether he distributed a controlled substance to a physically or mentally vulnerable person, § 2D1.1(b)(14)(B), or whether the defendant has aided attempts by law enforcement to address his and other drug offenses, § 5K1.1. A mandatory minimum sentence trumps an advisory Guideline calculation and the various factors considered by district courts under 18 U.S.C. § 3553(a). U.S.S.G. § 5G1.1(b); *United States v. Castaing-Sosa*, 530 F.3d 1358, 1361-62 (11th Cir. 2008) (per curiam). Consequently, a first-time offender with a relatively small role in a crime involving a threshold quantity of drugs might find himself sentenced to a five- or ten-year prison term even though his advisory Guideline range suggests a significantly lower sentence as a starting point for the sentencing judge.

In 1994, Congress addressed this "irony." Acknowledging that "mitigating factors that are recognized in the guidelines and generally are considered in drug

9

cases do not apply to the least culpable offenders except in rare instances," Congress provided a "safety valve." H.R. Rep. 103-460, *reprinted at* 1994 WL 107571 (Mar. 24, 1994); *see also* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. VIII, § 80001(a) (Sept. 13, 1994). When a defendant shows he meets the five criteria, *Cruz*, 106 F.3d at 1557, the safety valve requires a district court to impose a sentence without regard to the mandatory minimum specified by the statute, 18 U.S.C. § 3553(f); § 5C1.2; *United States v. Quirante*, 486 F.3d 1273, 1275-76 (11th Cir. 2007). Thus, the safety valve recognizes and "permit[s] a narrow class of defendants, those who are the least culpable participants in such offenses, to receive strictly regulated reductions in prison sentences for mitigating factors currently recognized under the federal sentencing guidelines." H.R. Rep. 103-460, *reprinted at* 1994 WL 107571.

In considering the safety valve, two of the criteria ensure the absence of the kind of conduct, other than quantity, that trigger an elevated mandatory minimum term under the drug statutes. The defendant must have no more than one criminal history point, and the offense cannot have resulted in death or serious bodily injury to any person. 18 U.S.C. § 3553(f)(1), (3); § 5C1.2(a)(1), (3). The defendant needs to be a limited actor who did not lead or supervise others or profit substantially from his activity. He is also required to have provided all the

10

information and assistance he can to law enforcement. 18 U.S.C. § 3553(f)(4), (5); § 5C1.2(a)(4), (5). One criterion – the only one at issue here – requires the defendant to show that he "did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense." 18 U.S.C. § 3553(f)(2); § 5C1.2(a)(2). If all five factors are met, no mandatory minimum sentence. If all five factors are not met, mandatory minimums apply.

In this case, no one claims Carillo used violence or credible threats of violence. Likewise, all agree Carillo possessed a firearm. He actually possessed quite a small arsenal and offered to sell even more than he possessed. The legal proposition cabined by Carillo is that he did not possess any firearms "in connection with the [drug] offense."

**B. Does Enhancement Under § 2D1.1(b)(1) Preclude Application of the Safety Valve?**

Neither the statute nor the guideline in question nor the commentary to it defines the phrase "in connection with." The United States' brief turns to the Sentencing Commission's definition of the term "offense" as "the offense of conviction and all relevant conduct." § 5C1.2 cmt. n.3. That definition is beside the point and not helpful. Conduct can become relevant under § 5C1.2 if it takes place "during the commission of the offense of conviction" § 1B1.3(a)(1). In this

11

sense, Carillo's possession of firearms was "relevant conduct" under § 5C1.2(a)(2). But subsection (a)(2) requires not just possession of a firearm but possession "in connection with the offense." Subsection (a)(3) does not require that death or serious bodily injury result "in connection with" the offense. Arguing that Carillo's possession of firearms was "relevant conduct" simply begs the question of whether he possessed them "in connection with the offense." In other words, are the drugs and guns discrete, or are they connected?

The "relevant conduct" argument may be an attempt to show the safety valve cannot apply when the two-level enhancement under § 2D1.1(b)(1) for possession of firearms is imposed. While that enhancement depends on Carillo's possession of firearms being "relevant conduct" under Chapter Two, the definition of relevant conduct is different for Chapter Two enhancements, *see* § 1B1.3(a), than it is for the safety valve, which is in Chapter Five, *see* § 1B1.3(b). To whatever extent the government contends that Carillo is not eligible for the safety valve because his possession of a firearm was "relevant conduct" under § 2D1.1(b)(1), the contention is rejected.

The government may nonetheless be correct that a defendant who receives the enhancement for possession of a firearm under § 2D1.1(b)(1) necessarily

12

possessed a firearm in connection with the offense under § 5C1.2(a)(2).[5] Certainly, that rule is appealingly simple.

There are indications, however, that the Sentencing Commission did not intend that result. First, § 2D1.1, the principal guideline governing drug cases and the one that applied in Carillo's case, imposes a two-level enhancement if "a weapon was possessed," § 2D1.1(b)(1), not if "a weapon was possessed in connection with the offense." This choice of language suggests that the phrase "in connection with" means something; there must be some reason the Commission did not use it in § 2D1.1(b)(1). If the Commission meant to say that the Chapter Two enhancement for "possession of a firearm" precludes a defendant from showing that he did not possess a firearm "in connection with the offense," there likely would be an application note in § 5C1.2 saying so.[6]

---

[5] If this is the rule, there is already one exception to it. A defendant may receive the enhancement based on a co-actor's reasonably foreseeable possession of a firearm "in furtherance of . . . jointly undertaken criminal activity" while the defendant was acting jointly with him. Section 1B1.3(a)(1)(B); *United States v. Gallo*, 195 F.3d 1278, 1284 (11th Cir. 1999) (applying rule of *Pinkerton v. United States*, 326 U.S. 640, 647 (1946)). But the Sentencing Commission states that "the term 'defendant,' as used in [§ 5C1.2](a)(2), limits the accountability of the defendant to his own conduct and conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused." Section 5C1.2 cmt. n.4; § 1B1.3(a)(1)(A). Consequently, a co-actor's possession cannot be attributed to the defendant under § 5C1.2 and cannot preclude relief under the safety valve. *United States v. Clavijo*, 165 F.3d 1341, 1343-44 (11th Cir. 1999) (per curiam); *In re Sealed Case*, 105 F.3d 1460, 1462-63 (D.C. Cir. 1997).

[6] When the safety valve applies, the defendant receives a two-level decrease in his offense level, § 2D1.1(b)(16) & cmt. n.20. For a defendant who did not possess a gun at all, this is all benefit. For a defendant who received the two-level enhancement under § 2D1.1(b)(1),

13

Second, conduct that meets the § 2D1.1(b)(1) possession standard will not, in all cases, show a "connection" between the firearm and the additional felony offense.  The explanation lies in a close look at the § 2D1.1(b)(1) enhancement. The enhancement concerns only possession, because § 2D1.1(b)(2) imposes another two-level enhancement if the defendant used, directed, or threatened to use violence, § 2D1.1 cmt. n. 11(B).  While the government generally has the burden of proving a guideline enhancement by a preponderance of the evidence, *United States v. Hernandez*, 145 F.3d 1433, 1440 (11th Cir. 1998), the § 2D1.1(b)(1) enhancement instead compels the government to show mere presence but places a heavy burden of negation on the defendant:

> The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.  For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet.

Section 2D1.1 cmt. n.11(A).[7]  In effect, the government benefits from a rebuttable presumption that a firearm, if present – just present, not present in proximity to drugs – is "connected with the offense."   The defendant must disprove a

---

qualification for the safety valve zeroes it out.

[7]  "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).

14

connection with the drug offense to the extent of showing it is "clearly improbable" they were symbiotic.

The safety valve works differently. It requires the defendant to prove he meets the five factors for relief by a preponderance of the evidence. *United States v. Poyato*, 454 F.3d 1295, 1296, 1300 (11th Cir. 2006) (per curiam); *Cruz*, 106 F.3d at 1557; *United States v. Nelson*, 222 F.3d 545, 550-51 (9th Cir. 2000) (holding that evidence need not be clear and convincing to meet § 5C1.2(a)(2)). While the proof may not show it is *clearly improbable* that a defendant possessed a firearm in connection with the offense, it may show that it is more than likely he did not. "It does not deductively follow from a defendant's failure to satisfy a higher quantum of proof on a particular issue that he cannot satisfy a lower quantum of proof on that same issue." *United States v. Bolka*, 355 F.3d 909, 914 (6th Cir. 2004).

Although we have previously addressed the interaction between § 2D1.1(b)(1) and § 5C1.2(a)(2), no case specifically poses the question of whether the enhancement under § 2D1.1(b)(1), based on the defendant's own conduct, precludes safety valve relief. In *Poyato*, we scrupulously preserved the distinction between the two sections. The government's argument in that case suggested that application of the enhancement under § 2D1.1(b)(1) necessarily precluded relief

15

under the safety valve, *see* 454 F.3d at 1297.  But the facts showed that the district court had found "the defendant in fact possessed a firearm *both* in furtherance and *in connection with* the offense . . . . by a preponderance of the evidence," *id.* at 1296 (emphasis added).  Our holding explicitly stated that relief under the safety valve was precluded because "the sentencing judge . . . did find by a preponderance of the evidence that Poyato did in fact possess a firearm *in connection with the offense*."  *Id.* at 1299-1300 (emphasis added).[8]

At least one of our sister circuits appears to hold that imposition of the enhancement under § 2D1.1(b)(1) necessarily precludes safety valve relief under § 5C1.2(a)(2).  *See United States v. Ruiz*, 621 F.3d 390, 397 (5th Cir. 2010) (per curiam).  Even so, the court did not address the distinction in language delimiting the burdens of proof between the two guidelines.  Yet those are the factors we find most significant and probative in considering whether a categorical bar to applying the safety valve exists by the mere presence of a gun.

We hold that not all defendants who receive the enhancement under § 2D1.1(b)(1) are precluded from relief under subsection (a)(2) of the safety valve.  Where "a firearm was possessed" by the defendant personally, and yet the

---

[8] In two unpublished decisions, as well, we assumed a defendant may be assessed the two-level enhancement under § 2D1.1(b)(1) without necessarily losing the opportunity to qualify for the safety valve under § 5C1.2(a)(2).  *United States v. Rodriguez*, No. 11-12517, 447 Fed. Appx. 936 (11th Cir. 2011) (per curiam); *United States v. Skinner*, No. 04-14311, 131 Fed. Appx. 650 (11th Cir. 2004) (per curiam).

16

defendant also seeks the protection of the safety valve, the district court must determine whether the facts of the case show that a "connection" between the firearm and the offense, though possible, is not probable. *See also Clavijo*, 165 F.3d at 1343-44; § 5C1.2 cmt. n.4 (safety valve not precluded for defendants to whom firearm is attributed on *Pinkerton* principles). The number of defendants who meet both guidelines will undoubtedly be rare. But this determination is consistent with Congress's intention that the safety valve will apply only to "a narrow class of defendants, those who are the least culpable participants in such offenses."

### C. "In Connection With"

Having decided that imposition of the enhancement under § 2D1.1(b)(1) does not automatically preclude a defendant from negating a "connection" between his firearm and his offense, we turn to the question of what constitutes a "connection."                 **1. Proximity to Drugs**

Cases decided under § 2D1.1 recognize that proximity between guns and drugs, without more, is sufficient to meet the government's initial burden under § 2D1.1(b)(1).[9]  *See, e.g.*, *United States v. Trujillo*, 146 F.3d 838, 847 (11th Cir.

---

[9]  To support the enhancement under § 2D1.1(b)(1), the prosecution must prove, by a preponderance of the evidence, that the firearm was "present at the site of the charged conduct" or possessed "during conduct associated with the offense of conviction," *United States v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006). Where the firearm "had some purpose or effect

17

1998) (firearm found in front office of warehouse in which 300 kilograms of cocaine were stored); *United States v. Hansley*, 54 F.3d 709, 715-16 (11th Cir. 1995) ("agents found a firearm and other [unidentified] drug-related items" in residence where defendant "engaged in conspiratorial conversations"); *United States v. Hall*, 46 F.3d 62, 63-64 (11th Cir. 1995) (per curiam) (handgun found in a dresser drawer in same bedroom with scales, a ziplock bag containing cocaine residue, and a purse containing $12,000 in cash).   While other facts, such as whether the firearm is loaded, or inside a locked container, might be relevant to negate a connection, there is a strong presumption that a defendant aware of the weapon's presence will think of using it if his illegal activities are threatened.  The firearm's *potential* use is critical.    The Sentencing Commission gives special status to guns found in proximity to drugs.  Section 2K2.1, the primary guideline for firearms offenses, has long imposed a four-level enhancement if a defendant

with respect to the drug trafficking crime," *United States v. Timmons*, 283 F.3d 1246, 1251 (11th Cir. 2002), that, of course, will also suffice.  The § 2D1.1(b)(1) enhancement will also apply under the circumstances described in *Gallo*, 195 F.3d at 1284.  In *Stallings*, the merest of "mere possession" cases, a conspiracy defendant was arrested in his home, where three firearms were also found.  But there was no indication at all that the defendant engaged in any conspiracy-related activities in the home, much less that he carried a firearm with him at any point.  We held the § 2D1.1 enhancement did not apply.  463 F.3d at 1220-21.  In *United States v. Clay*, 376 F.3d 1296 (11th Cir. 2004), the government met its initial burden by showing that the defendant possessed a firearm during conduct "associated with" the offense of conviction, because the defendant had a firearm in a closet of his residence while he executed part of his role in the drug conspiracy.  But that conduct was limited to making phone calls to a co-defendant.  There were no drugs or paraphernalia in the residence, and no other activity in furtherance of the conspiracy occurred there.  The district court found that a "connection" between the offense and the firearm was "clearly improbable," and this court affirmed.  *Id.* at 1302-03.

"used or possessed a firearm in connection with another felony offense" or possessed or transferred a firearm with knowledge or reason to believe "it would be used or possessed in connection with another felony offense." Section 2K2.1(b)(6)(B) (formerly (b)(5)). In November 2006, the Commission added to this guideline a note explaining what is meant by "in connection with":

> 14. "In Connection With".—
>
> (A) In General.--Subsections (b)(6)(B) and (c)(1) apply if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense or another offense, respectively.
>
> (B) Application When Other Offense is Burglary or Drug Offense.-- Subsection[] (b)(6)(B) . . . [applies] in the case of a drug trafficking offense in which a firearm is found in *close proximity* to drugs, drug-manufacturing materials, or drug paraphernalia. In these cases, [the enhancement] is warranted because the presence of the firearm has the potential of facilitating another felony offense or another offense, respectively.

Section 2K2.1 cmt. n.14.

Our case law and the Commission's application are consistent: A firearm found in close proximity to drugs or drug-related items simply "*has*" – without any requirement for additional evidence – the potential to facilitate the drug offense. A defendant seeking relief under the safety valve, despite his possession of a weapon found in proximity to drug-related items, will have a difficult task in showing that, even so, there is no connection with the drug offense so the safety valve applies.

19

## 2. "Facilitated, or Had the Potential of Facilitating"

Where a defendant engages in a drug offense and also possesses a firearm, but the firearm is not in proximity to drugs or paraphernalia, the Commission's application note in § 2K2.1 is similarly helpful. The Commission "adopt[ed] the language from *Smith v. United States*, 508 U.S. 223 (1993)," to define what constitutes use or possession of a firearm "in connection with" a drug offense. Section 2K2.1 cmt. historical notes (2006). *Smith* was issued in the term immediately preceding Congress's amendment of 18 U.S.C. § 3553, when it adopted the safety valve provision. *Smith* was the Supreme Court's latest word on the interplay of guns and drugs when the statutory language of the safety valve was formulated.

We turn, then, to *Smith* and to the case from which it borrowed the Commission note's phrase "facilitated, or had the potential of facilitating," *United States v. Stewart*, 779 F.2d 538 (9th Cir. 1985).[10] The question in *Stewart* was whether the defendant "carr[ied] a firearm unlawfully during the commission of

---

[10] In *Muscarello v. United States*, 524 U.S. 125 (1998), the Supreme Court again referred to the *Stewart* court's discussion of "during and in relation to." Its citation noted that *Stewart* had been overruled on other grounds by *United States v. Hernandez*, 80 F.3d 1253, 1257 (9th Cir. 1996). *See Muscarello*, 524 U.S. at 137. *Hernandez* held that a gun in a garage in a locked toolbox with cocaine was not "used or carried" during or in relation to a drug trafficking crime, following *Bailey v. United States*, 516 U.S. 137 (1995). But *Hernandez* itself was disapproved of in *United States v. Foster*, 165 F.3d 689, 692 & n.5 (9th Cir. 1999) (en banc), based on the *Muscarello* Court's definition of "carried."

any felony," 18 U.S.C. § 924(c)(2) (1982).  After the date of the defendant's arrest, the statute was amended to read "during and in relation to," but the court held that "during," even at the time of the defendant's crime, meant "during and in relation to."  It further held that that phrase itself meant there must "some relation or *connection* between the underlying criminal act and the use or possession of the firearm."  *Stewart*, 779 F.2d at 540 (emphasis added).  It also said that such a relation or connection exists where "the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such display or discharge in fact occurred."  *Id.*

Our cases interpreting guidelines that require a "connection" have consistently recognized that a firearm which facilitates or has the potential to facilitate an offense is possessed "in connection with" that offense.  In *United States v. Jackson*, 276 F.3d 1231 (11th Cir. 2001) (applying § 2K2.1(b)(5), now (b)(6)(B)), we expressly held that "possession of a firearm with intent to use it to facilitate the commission of a felony offense, or with intent to use it *should it become necessary* to facilitate [a] crime, is possession 'in connection with' that offense."  *Id.* at 1234-35 (emphasis added).  The defendant in that case, struggling with officers who were trying to handcuff him, repeatedly attempted to reach into

21

the left front pocket of his pants, which later proved to contain a .38-caliber Beretta pistol.  He claimed he did not possess the firearm "in connection with" the offense of resisting arrest, as required by the guideline, because he did not plan to be arrested and so harbored no intent to use the firearm in relation to a crime.  The argument was not persuasive. *Id.*

Where two defendants concealed disassembled firearms in their vehicle as they traveled through the Gulf States using counterfeit currency, we found their continued retention of the weapons, which easily could have been reassembled and armed for use, showed they intended to use the firearms if they felt the need, so the weapons were possessed in connection with the offense.  *United States v. Rhind*, 289 F.3d 690, 695 (11th Cir. 2002) (applying former § 2K2.1(b)(5)).

Where a felon stole a rifle, he possessed that rifle "in connection with" the burglary during which he stole it, although it was a fruit and not an instrument of the crime.  *United States v. Young*, 115 F.3d 834, 838 (11th Cir. 1997) (per curiam) (applying § 4B1.4(b)(3)(A)).  The reasoning of *Young* relied in part on the observation in *United States v. Guerrero*, 5 F.3d 868 (5th Cir. 1993): "If armed burglars encounter the occupants of a home or law enforcement officials, it makes little difference how the burglars obtained their firearms." *Id.* at 873.

We have found a connection even where the defendant did *not* use the

22

firearm in a crisis. In *United States v. Matos-Rodriguez*, 188 F.3d 1300 (11th Cir. 1999) (applying § 2B5.1(b)(4)), the defendant fled the scene of the crime to evade what he thought was an attempt to rob him immediately after he completed a transaction involving counterfeit currency. In flight, he threw a loaded semiautomatic pistol out the window of his vehicle. Despite these facts, we affirmed the district court's finding that Matos armed himself before he went to the scene "to guard against the potential that his other . . . partner in crime . . . might very well be inclined to conclude the deal" by cheating or robbing him. *Id*. at 1309. Even with the defendant's abandonment of the firearm, the proof was sufficient to support a connection between the firearm and the offense because the defendant *could have* used the firearm to protect his criminal activity.

Each of these cases focused on the firearm's potential for use as a weapon. In 1993, the Supreme Court recognized a new dimension to the concept of "facilitation" – using the firearm not for its potential as a weapon but as an item of barter given in exchange for drugs:

> We need not determine the precise contours of the "in relation to" requirement here, however, as petitioner's use of his MAC-10 meets any reasonable construction of it. The MAC-10's presence in this case was not the product of happenstance. On the contrary, far more than in the ordinary case under § 924(c)(1), in which the gun merely facilitates the offense by providing a means of protection or intimidation, here the gun was an integral part of the transaction. Without it, the deal would not have been possible. The undercover

23

officer posing as a pawnshop dealer expressly told petitioner that he was not in the narcotics business and that he did not get involved with drugs. For a MAC-10, however, he was willing to see if he could track down some cocaine.

*Smith*, 508 U.S. at 238 (internal citation, brackets, and quotation marks omitted).

This broad view of "facilitation" is exemplified by the facts of *United States v. Audain*, 254 F.3d 1286 (11th Cir. 2001) (per curiam), a case considering whether the district court correctly applied the enhancement under § 2D1.1(b)(1).[11] The defendant was an INS agent who wore his uniform, including his service weapon, to meet a drug courier newly arrived from Haiti as he disembarked onto a jetway at the Miami airport. He escorted the courier all the way through the airport "in order to avoid Customs agents and agents of the INS." *Id.* at 1289. He tried to show that a connection between the firearm and his drug offense was "clearly improbable" because the firearm was simply part of his uniform, not something he chose to take

---

[11] Decided five years before the Commission added its definition note to § 2K2.1, *Audain* stated the government need not prove the firearm "was used to facilitate the distribution of drugs." 254 F.3d at 1289. As used in that and other decisions, however, the term "facilitate" was understood to mean the firearm was used in some manner or played some active role in the offense. The government need not prove that much. Even in *Jackson*, for instance, where a "connection" was specifically required by the guideline, the court said that, "in certain circumstances, mere possession of a firearm can be enough." 276 F.3d at 1234. By contrast, in *United States v. Stallings*, 463 F.3d 1218 (11th Cir. 2006), decided under § 2D1.1(b)(1), we said "[t]he government must show some nexus beyond mere possession between the firearms and the drug crime." *Id.* at 1221. As exemplified by our discussion of *Audain*, the definition of "in connection with" in *Smith*, *Stewart*, and the Sentencing Commission's note to § 2K2.1 as "facilitates or has the potential to facilitate" is fully consistent with the conduct actually found to constitute a "connection" in this court's prior decisions, even though some of those decisions have rejected the term "facilitates" as an accurate description of what is required.

24

to the jetway in case he needed to defend the drugs or the courier. Although "Audain knowingly assisted in the transportation of drugs while carrying a firearm," *id.*, and the firearm was in fact in proximity to the drugs the courier was carrying, that is not the only important aspect of the case. We said it was an "undisputable fact that a personal escort by an armed INS agent greatly increases the chances for successful drug trafficking." *Id.* at 1290. We explained that the firearm was "closely linked to the very powers and office which appellant used to implement his felonious activities" and "quite probably instilled confidence in those who relied upon him for protection." *Id.* (quoting *United States v. Ruiz*, 905 F.2d 499, 508 (1st Cir. 1990)). A uniform with a sidearm makes gun violence possible, but its principal significance is to show lawful authority. It allows the wearer to go places and do things outside the usual channels established to detect illegal activity. It enhances an agent's authority and diminishes the likelihood that someone will look at him suspiciously. The firearm itself makes the INS agent different from, say, private security guards, or many campus police officers. In addition to having the potential to intimidate, which all firearms have, a uniform sidearm has another characteristic as a firearm that plainly facilitated the offense. The gun's presence made the defendant's conduct more culpable and supported the finding of a "connection" between the offense and the firearm.

25

In a recent Fifth Circuit case, a Customs and Border Patrol agent wore his uniform, including sidearm, while he met with a confidential witness "to discuss the terms of his assistance in smuggling the drugs" and while he monitored local law enforcement activity as the witness drove 25 kilograms of cocaine through the jurisdiction. *United States v. Ruiz*, 621 F.3d 390, 396-97 (5th Cir. 2010) (per curiam). The firearm was never in proximity to drugs. But it was present while Ruiz was arranging and executing the offense. Like the uniform sidearm in *Audain*, the firearm was closely linked to the powers of office the defendant abused in committing the drug offense, and it contributed to inspiring his co-conspirators. The court affirmed the application of the enhancement under these circumstances. *Ruiz*, 621 F.3d at 395-97.

A firearm in proximity to drugs is connected with a drug offense because it has the potential to be used as a weapon. Sale of a firearm in exchange for drugs facilitates a drug offense. But a firearm does not have the potential to facilitate a drug offense simply because it has the potential to be sold for drugs. The scope of the phrase "potential to facilitate the offense" is limited to circumstances showing the firearm's availability for use as a weapon or the attempt to use the firearm in a manner that would facilitate the offense.

### 4. Conclusion

26

We hold that, under § 5C1.2(a)(2), a defendant possesses a firearm in connection with a drug offense if the firearm is in proximity to drugs or if the firearm facilitates the drug offense, whether by emboldening an actor who had the ability to display or discharge the weapon, *Rhind*, 289 F.3d at 695; *Matos-Rodriguez*, 188 F.3d at 1309; *Young*, 115 F.3d at 838; *Stewart*, 779 F.2d at 540, by serving as an integral part of a drug transaction as in a barter situation, *Smith*, 508 U.S. at 238, by instilling confidence in others who relied on the defendant, or serving as a "badge of office" to help the defendant avoid detection, *Audain*, 254 F.3d at 1290. Where any of these possibilities are shown by the evidence, the safety valve is unavailable unless the defendant negates the proof by a preponderance of the evidence, or unless the government precludes relief by proving the fact by a preponderance of the evidence.

A "connection" is shown by *less* evidentiary proof than is required to show possession "in furtherance of" a drug offense. "[T]he presence of a gun within the defendant's dominion and control during a drug trafficking offense is not sufficient by itself" to show possession in furtherance, *Timmons*, 283 F.3d at 1253, that is, to show the firearm "was possessed to advance or promote the commission of the underlying offense," *id.* at 1252 (discussing H.R. Rep. 105-344 at 12 (1997) (explaining amendment of 18 U.S.C. § 924(c) in light of *Bailey v. United States*,

27

516 U.S. 137 (1995))).  But the presence of a gun within a defendant's dominion and control during a drug trafficking offense ordinarily *will* suffice to show possession during and in relation to the offense and, therefore, that the defendant possessed the firearm in connection with the offense.[12]

The discussion here is focused only on the "connection" element, not the element of possession.  *Cf. Stallings*, 463 F.3d at 1220 (questioning both elements).  In many cases, the extent of a defendant's intent to exercise control over a firearm in proximity to drugs will pose a difficult question for a district court, but that is not an issue in this case.[13]  We observe only that the defendant has the burden of

---

[12]  In 2007, the Supreme Court unanimously held that a defendant who *receives* a firearm in exchange for drugs does *not* use or carry a firearm during and "in relation to" a drug trafficking crime.  *Watson v. United States*, 552 U.S. 74, 76 (2007).  (As Justice Ginsburg concluded, "[i]t is better to receive than to give . . . at least when the subject is guns."  *Id.* at 84 (Ginsburg, J., concurring in the judgment).)  *Watson* is not material to our decision here; it addressed the intersection of *Smith* and *Bailey*.  Where *Smith* addressed both the word "use" and the phrase "in relation to," *Bailey* clarified that "use" required "active employment."  Given the *Bailey* Court's exposition of "use," several circuits had already concluded that receiving a firearm in exchange for drugs could not be governed by the rule of *Smith*.  *See Watson*, 552 U.S. at 78 n.5 (noting circuit split).  *Watson* held that receiving a firearm is not actively employing it.  *Watson* did not alter the *Smith* Court's exposition of the phrase "in relation to."  Section 5C1.2(a)(2) requires only *possession*, not use or carrying.  Receiving a firearm in exchange for drugs would constitute possession in connection with a drug offense.

[13]  To be in constructive possession of a firearm, the defendant must know it is there.  *United States v. Cochran*, 683 F.3d 1314, 1319-20 (11th Cir. 2012).  In *Clavijo*, the defendant "had no knowledge of the firearm."  165 F.3d at 1342.  *Clavijo*, therefore, does not speak to constructive possession.  We have not specifically questioned whether constructive possession of a firearm in connection with the offense will defeat the safety valve under § 5C1.2(a)(2), though virtually every other court to consider the issue has held that it will.  Other courts have held that constructive possession disqualifies a defendant from safety valve relief under (a)(2).  *United States v. Jackson*, 552 F.3d 908, 909-10 (8th Cir. 2009) (per curiam); *United States v. Matias*, 465 F.3d 169, 173-74 (5th Cir. 2006); *United States v. Herrera*, 446 F.3d 283, 287 (2d Cir.

negating connection or possession.

We turn now to the facts of Carillo's case.

## D. Did Carillo Possess Firearms In Connection With His Drug Offense?

The district court found that Carillo's own conduct merited the § 2D1.1(b)(1) enhancement and also precluded relief under the safety valve. But, as the judge noted, Carillo's conduct was somewhat unusual.

### 1. Conduct Prior to October 14, 2009

This period of Carillo's offense presents a type of facilitation that has not been previously addressed in case law, so far as we have been able to discover. A successful course of conduct in firearms sales led to successful drug sales. Adame's relationship with Jones began as a series of firearms sales. With those transactions as foundation, Adame spontaneously raised the possibility of a heroin sale. The course of the relationship between Adame and Jones built their trust in each other. Adame eventually introduced Carillo, his supplier, to Jones. Because he was aware of the relationship between Adame and Jones, Carillo stepped in to measure Jones's trustworthiness for himself and to "cut out the middleman." He intended to deal with a good customer directly. Undeniably, guns and drugs were

---

2006); *United States v. Gomez*, 431 F.3d 818, 820-22 (D.C. Cir. 2005); *United States v. McLean*, 409 F.3d 492, 501 (1st Cir. 2005); *United States v. Stewart*, 306 F.3d 295, 327 n.19 (6th Cir. 2002); *Sealed Case*, 105 F.3d at 1463-65 (D.C. Cir. 1997). Only the Tenth Circuit holds to the contrary. *United States v. Zavalza-Rodriguez*, 379 F.3d 1182, 1188 (10th Cir. 2004).

29

part of Carillo's interactions with Jones. The firearms transactions greased the wheels for the drug transactions. In this way, discussions about and sales of firearms did indeed "facilitate" Carillo's sale of methamphetamine to Jones. As the probation officer put it, people who engage in illegal drug sales frequently have "trust issues," and this ongoing relationship spoke directly to those issues.

Unlike the "badge of office" cases where the defendant's possession and display of a service firearm, as a show of legitimate authority, was an integral part of his ability to commit the offense, here there is no meaningful distinction between talking about or trading in firearms and talking about or trading in pornography or sports jerseys as ways of "facilitating" the drug offense.

For this period of Carillo's conduct, there is no reason to think Carillo needed to protect drugs or drug proceeds, because no drugs were present. He exchanged no firearms for drugs and no drugs for firearms. Carillo and Jones did not discuss a connection between the drugs and the firearms. As the district court said, "This was like going to the cafeteria and you take one from this pot and one from that pot, you know, I'll have some of each." One day it was drugs, another day firearms. Discussing or exchanging firearms to "grease the wheels" for drug sales, by itself and without anything more, does not suffice to show that a defendant possessed firearms "in connection with" his drug offense.

30

Here, however, there was more.  With Carillo's business being mixed, as it was, one could reasonably question whether he put the money he received for the firearms to work in his drug enterprise.  If so, the firearms facilitated his drug offense, and he possessed them "in connection with" it.  *See, e.g.*, *United States v. Taylor*, 413 F.3d 1146, 1150, 1155 (10th Cir. 2005) (applying § 4B1.2) (defendant sold gun to agent for cash, took cash to his supplier and bought drugs, then sold drugs to same agent).  He had the burden of negating a connection, but he produced no evidence.  Even if the district court had considered only this period of Carillo's conduct, Carillo would not be entitled to relief under the safety valve.

But there is more.  Adame asked Jones, at one point, why he "wanted all these guns," and Jones replied in terms taken to indicate a source in Mexico and trafficking across the United States.  The timing of that conversation, closely followed by Carillo's asking to meet Jones himself, suggests that Jones's response made Carillo think he had a lucrative opportunity in the offing.  Whether Carillo knew of that conversation or not, the number and unusual types of firearms and other weapons that Jones and Carillo discussed, the fact that Carillo was not selling user quantities of drugs to Jones, and the duration and constant reiteration of Jones's interest in both drugs and guns, all make it clear that Carillo knew he was selling firearms to a drug dealer.  Under these circumstances, even if Carillo had

31

been more cautious and sold Jones drugs on even-numbered days and firearms on odd-numbered days, he still would have been a drug dealer selling drugs to another drug dealer and a firearms dealer selling firearms – to another drug dealer. Selling firearms to Jones would facilitate Jones's ability to turn over the drugs he bought from Carillo and so enable Jones to come back for more guns and more drugs. This kind of behavior "dramatically heightens the danger to society," *Smith*, 508 U.S. at 239, and makes Carillo just as culpable as one who carries a gun on his person while buying and selling drugs. A defendant drug dealer who knows he is selling both drugs and guns to a person he believes to be another drug dealer possesses the firearms he sells "in connection with" his drug offense, even if the guns and drugs are "sold separately."

### 2. Conduct on October 14, 2009

On October 14, 2009, Carillo sold both methamphetamine and firearms to Jones. There is no evidence that Carillo's firearms were loaded and ready to be used or that Carillo felt he might need a firearm to protect himself against Jones. But lack of information does not assist a defendant under a guideline that gives him the burden of proof. The proximity of the guns to the drugs alone had the potential to facilitate the offense. The rifle and shotgun were possessed in connection with the drug offense.

32

### III. Conclusion

The district court correctly denied relief under the safety valve.  Carillo-Ayala does not fall in that narrow class of defendants who are the least culpable participants in drug offenses.

AFFIRMED.

33