[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-13352

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DAVID LEE BERRY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 5:19-cr-00480-LCB-HNJ-18

_____

Before WILSON, BRANCH, and BRASHER, Circuit Judges.

PER CURIAM:

David Berry appeals his convictions and 210-month sentence for conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), (b)(1)(B), and (b)(1)(C), and the unlawful use of a communications facility, in violation of 21 U.S.C. § 843(b).  He argues that (1) venue in the Northern District of Alabama was improper, and his counsel's failure to challenge venue constituted ineffective assistance of counsel; (2) there was insufficient evidence to support his conspiracy conviction; (3) the district court abused its discretion in admitting hearsay testimony; and (4) the district court erred in finding that he was ineligible for safety-valve relief at sentencing.  After review, we affirm.

## I.    Background

Berry and 25 co-conspirators were indicted in the Northern District of Alabama on one count of conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A), (b)(1)(B), and (b)(1)(C) ("Count One").  Berry was also indicted on one count of the unlawful use of a communication facility in furtherance of the conspiracy offense, in violation of 21 U.S.C. § 843(b) ("Count Eleven").

At trial, the government presented testimony from multiple witnesses, including some of Berry's co-conspirators.  As part of an investigation into an influx of methamphetamine in Alabama, law enforcement obtained wiretaps on several phones, including two of co-conspirator Eric Sanders's phones.  Co-conspirator Anthony Skelton, who pleaded guilty to conspiracy to distribute and possess with intent to distribute 50 grams or more of  methamphetamine, testified that he had known Berry for many years, and he saw Berry deliver methamphetamine to a mutual friend's house.  Skelton also obtained methamphetamine from Berry regularly.  Berry obtained his methamphetamine from Sanders.  Berry gave Skelton a pre-paid cell phone with Sanders's contact information programmed into it, so that Skelton could "get meth" from Sanders.  Skelton also saw Sanders deliver methamphetamine to Berry's house on at least two occasions, and Berry sold Skelton some of the methamphetamine for anywhere between $350 to $600 an ounce.

A recording of a phone call between Skelton and Sanders was played for the jury.  Skelton testified that in the call, he asked Sanders how much a pound of methamphetamine would cost, and Sanders stated it would be $5,000.  Skelton and another co-conspirator, Roger Lay, had a buyer who had agreed to pay $6,200 for the methamphetamine, netting a total $1,200 profit, which they planned to split between the two of them.  They met Sanders and purchased the pound of methamphetamine, but they were stopped and arrested by law enforcement after the sale.

Sanders, who also pleaded guilty to conspiracy to distribute and to possess with intent to distribute 50 grams or more of methamphetamine, testified as follows.  Since 2017, Sanders has made his living selling methamphetamine, and he kept the drugs at his house in Town Creek, Alabama.  Sanders sold Berry methamphetamine "a bunch of times."  Sanders would drive from Alabama to a market in Tennessee near Berry's home to make the exchange—later, they began meeting at Berry's home.  He sold Berry two to four ounces of methamphetamine about twice a week.  Sometimes, Sanders would also "front" Berry methamphetamine if Berry did not have the money to pay for the drugs at the time of delivery.

The government then presented several recorded phone calls between Berry and Sanders.  In one phone call, Berry asked Sanders for two ounces of methamphetamine.  On the call, Berry stated that his sales had slowed down and people were "undercutting him" and selling methamphetamine for less.  Two other calls in which Berry asked Sanders for four and then three ounces of methamphetamine, respectively, were played for the jury.  Sanders confirmed that Berry introduced Skelton to him so that Skelton could buy methamphetamine from Sanders.

When Sanders learned that Skelton and Lay had been arrested after he sold them a pound of methamphetamine in February 2019, he called Berry.  Berry advised Sanders to not sell any more methamphetamine to Skelton.  A few days later, Berry sent a text message to Sanders asking for a half pound of marijuana

and four ounces of meth. Sanders called Berry in response to the text, and they arranged for Sanders to drop off the drugs in the back of an old abandoned house in Tennessee near where Berry lived. Berry expressed concern that the police might be watching him. In a phone call on the day that Sanders was to deliver the drugs to the house, Berry explained that he did not have the money for the marijuana and he had left Sanders money for the methamphetamine only. Sanders agreed to leave the marijuana because of his relationship with Berry, and Berry assured Sanders that he would send Sanders money for the marijuana.

Sanders continued to sell approximately two to four ounces of methamphetamine a week to Berry until Sanders's arrest in October 2019. Sanders confirmed that one person could not have personally consumed the amount of methamphetamine he sold to Berry on a regular basis, and he noted that Berry talked about his customers during their calls and introduced Sanders to other customers.

Finally, Captain Timothy Beckham with the Wayne County, Tennessee, Sheriff's Office testified. In February 2019, Beckham and other officers conducted surveillance on an old house where a suspected delivery of drugs was to be made. He observed Berry arrive at the house and pick up the drugs. The officers left after they observed Berry pick up the drugs. On their route back to the office, they observed Berry in a bank parking lot pulled up next to another truck which had its hood open. The other truck belonged to Kyle Haggard. Beckham pulled into the lot and

Haggard indicated that he was having car trouble, but it was fixed now. Beckham then left, but, shortly thereafter, Haggard called one of the officers in Beckham's car. The call was audible over the car's Bluetooth device. Beckham testified that Haggard said: "that's not what it looked like."[1]

Following Beckham's testimony, the government rested, as did Berry. Berry did not move for a judgment of acquittal. The jury found Berry guilty as charged. Berry then moved for a new trial and a post-verdict judgment of acquittal, arguing that the jury's verdict was against the great weight of the evidence and that the district court committed reversible error in admitting the hearsay testimony of Haggard. The district court denied his motion.

Prior to sentencing, the United States Probation Office prepared a presentence investigation report (PSI), in which it determined that Berry did not satisfy the safety-valve provision of

---

[1] Berry raised a hearsay objection to Beckham testifying as to what Haggard said on the call. The government explained that the statement was being offered to show Haggard's state of mind only, not for the truth of the matter asserted. Berry argued that Haggard's state of mind was not relevant, and, even it was, it was unduly prejudicial and should be excluded under Federal Rule of Evidence 403. The court overruled the objection, but it agreed to provide a limiting instruction. The district court instructed the jury that "[y]ou are about to hear the statement from the witness, and you can use as evidence of Kyle Haggard's state of mind, but not that Kyle Haggard's statement was true."

U.S.S.G. § 5C1.2(a)[2] because, although he had made two proffers to the government, he had not truthfully provided all information and evidence that he had related to the unlawful use of a communications facility count.  Berry filed a motion for safety-valve relief under 18 U.S.C. § 3553(f), asserting in relevant part that he satisfied all of the criteria and that he had "told all he knows about the crime through two proffers."

At sentencing, the district court adopted the PSI and determined that Berry's advisory guidelines range was 188 to 235 months' imprisonment.  Berry renewed his request for safety-valve relief under § 3553(f).  Counsel also read a statement that Berry had prepared in which he stated that he was a "drug user and an addict" and that the "only reason [he] got caught up in this trade was [his] personal need for drugs."  He emphasized that he had no criminal history and had been a "law-abiding citizen" for most of his life.  He stated that he was "full of regret" and apologized to his family for his actions.

---

[2] U.S.S.G. § 5C1.2(a) permits a district court to disregard an applicable statutory minimum sentence when imposing a sentence if the defendant meets certain criteria.  This guidelines provision cross-references 18 U.S.C. § 3553(f), which is the statutory safety-valve provision.  One of the requirements a defendant must satisfy is that he "has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan."  18 U.S.C. § 3553(f)(5).  As relevant here, Berry faced a ten-year statutory minimum sentence for the conspiracy count and a maximum of life imprisonment.

The government opposed Berry's safety-valve request, arguing that:

> [Berry] certainly did not tell us everything he knew about the crimes in this case. [He] [d]idn't ever mention anything about the events on Count Eleven, which he was convicted of.
>
> If you will recall, that involved the phone call where he asked Eric Sanders to come to his house and go across the street to the little abandoned house from their property and put the methamphetamine inside the house.
>
> And there was some discussion about his customer had not left the money for the marijuana, and so did Eric Sanders want to bring the marijuana, or, you know, did he not want to travel back to Hunstville with it in there, because it's dangerous to drive with it in the car. And Eric said, no, I will go ahead and bring it to you. And [Berry] said, Well, I will make sure you . . . get paid for it. [He] [n]ever told us anything about that in the proffers.

The government also emphasized that, even in his statement to the court, Berry failed to be truthful about his conduct and denied being a dealer. The government requested a within-guidelines sentence.

The district court then sentenced Berry to total term of 210 months' imprisonment, implicitly denying his request for safety

valve relief. The district court emphasized that "the evidence at trial was overwhelming that [Berry was] a drug dealer," and that a 210-month sentence was appropriate in light of the § 3553(a) sentencing factors. This appeal followed.

## II.    Discussion

### A.    *Whether venue was proper in the Northern District of Alabama*

Berry argues that venue in the Northern District of Alabama was improper because he lived in Tennessee, and the drug transactions he participated in occurred in Tennessee. He maintains that the government proffered no evidence that he committed any overt act in Alabama, and his counsel rendered constitutionally ineffective assistance by failing to object to venue.

A defendant has a Sixth Amendment right "to be tried in the district in which the crime was committed." *United States v. Little*, 864 F.3d 1283, 1287 (11th Cir. 2017) (quotations omitted). "However, a defendant waives an objection to venue by failing to raise it before trial, subject to the exception that objecting at the close of evidence is soon enough if the indictment alleges an incorrect venue and the defendant was not aware of that defect until the government presented its case." *United States v. Greer*, 440 F.3d 1267, 1271 (11th Cir. 2006).

Berry did not object to venue at any point prior to, or during, the trial. Therefore, he waived any venue challenge. But, even if the issue was not waived, venue in the Northern District of

Alabama was proper.  When an offense is committed in more than one district, the offense can be prosecuted "in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a).  "In a conspiracy case, venue is proper in any district where an overt act was committed in furtherance of the conspiracy." *United States v. Smith*, 918 F.2d 1551, 1557 (11th Cir. 1990).  Here, the crime of conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine occurred in both the Northern District of Alabama and parts of Tennessee.  Sanders stored the drugs in his home in the Northern District of Alabama, and then he transported them to Tennessee to sell to Berry and other members of the conspiracy.  Thus, venue was proper in either district. *See United States v. Lewis*, 676 F.2d 508, 511 (11th Cir. 1982) ("[W]here a criminal conspirator commits an act in one district which is intended to further a conspiracy by virtue of its effect in another district, the act has been committed in both districts and venue is properly laid in either.").[3] Accordingly, Berry is not entitled to relief.

B. *Whether sufficient evidence supports Berry's conspiracy conviction*

Berry argues that his conspiracy conviction amounts to a manifest injustice because the evidence was insufficient to support his conviction.  He maintains that he purchased drugs for personal

---

[3] Because we conclude that venue was proper, Berry's claim that his counsel was ineffective for failing to object to venue necessarily fails.

use from Sanders and the government did not present any evidence of an agreement to distribute drugs.  Additionally, he argues that there was no evidence that he knew of, participated in, or otherwise benefitted from the drug transaction between Sanders and Lay and Skelton, such that this transaction could not serve as the basis for his conspiracy conviction.

Generally, "[w]e review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government and accepting all reasonable inferences in favor of the verdict." *United States v. Tagg*, 572 F.3d 1320, 1323 (11th Cir. 2009) (quotations omitted).  However, where, as here, the defendant fails to challenge the sufficiency of the evidence by moving for a judgment of acquittal at trial, "we may reverse the conviction only to prevent a manifest miscarriage of justice.  This standard requires the appellate court to find that the evidence on a key element of the offense is so tenuous that a conviction would be shocking." *Id.* (quotations omitted).

> A conspiracy conviction requires the government to prove the following: (1) [an] agreement between two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in that agreement by the defendant; and (3) an overt act in furtherance of the agreement.  The existence of an agreement may be established by proof of an understanding between the participants to engage in illicit conduct, and the typical proof required to prove legitimate contracts is not required.  This proof may

be provided through circumstantial evidence, such as inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.

*United States v. Achey*, 943 F.3d 909, 916 (11th Cir. 2019) (quotations and internal citations omitted). "[A] simple buyer-seller controlled substance transaction does not, by itself, form a conspiracy." *Id.* at 917. However, "a conspiracy can be found if the evidence allows an inference that the buyer and seller knew the drugs were for distribution instead of merely understanding their transactions to do no more than support the buyer's personal drug habit." *Id.* (quotations omitted). An agreement may also be inferred "when the evidence shows a continuing relationship that results in the repeated transfer of illegal drugs to the purchaser" or "where the amount of drugs allows an inference of a conspiracy to distribute drugs." *Id.* (quotations omitted); *see also United States v. Brown*, 587 F.3d 1082, 1089 (11th Cir. 2009) ("[A]s is well-established in this Circuit, where there are repeated transactions buying and selling large quantities of illegal drugs, that is sufficient evidence that the participants were involved in a conspiracy to distribute those drugs in the market.").

Here, the evidence was more than sufficient for a jury to infer that a conspiracy existed based on the repeated drug transactions between Berry and Sanders, the amount of drugs transferred, and the recorded phone calls, in which Berry occasionally referred to his customers and competitors who were

"undercutting him" and selling methamphetamine for less. Additionally, a jury could have inferred that a distribution conspiracy existed based on the fact that Sanders occasionally fronted Berry drugs without payment. *See United States v. Beasley*, 2 F.3d 1551, 1560 (11th Cir. 1993) (noting that evidence established more than a simple buyer-seller relationship where evidence showed that the co-conspirator sometimes fronted drugs to the defendant). The fact that Berry did not participate in the drug transaction between Skelton, Lay, and Sanders is not relevant because Berry is "liable for any act done by a co-conspirator in furtherance of the conspiracy." *United States v. Grady*, 18 F.4th 1275, 1283 n.4 (11th Cir. 2021) (quotations omitted). Accordingly, Berry cannot show that his conspiracy conviction resulted in a manifest miscarriage of justice.

## C. Whether the district court erroneously admitted hearsay testimony

Berry argues that the district court improperly admitted Captain Beckham's testimony regarding Haggard's hearsay statement "that's not what it looked like."[4] He maintains that, although the government offered it to prove Haggard's state of mind, his state of mind was not relevant and the statement should

---

[4] Berry indicates in his brief that Haggard said "[t]hat's not what it appeared to be." However, at trial, Captain Beckham testified that Haggard said "that's not what it looked like." For purposes of this opinion, we rely on the statement as it appears in the record.

have been excluded as unduly prejudicial.  He maintains that the district court's limiting instruction did not cure any error because Haggard's statement suggested that Berry had a reputation as a drug dealer, and the prejudice from such a comment affected his substantial rights and constituted reversible error.

"We review a district court's evidentiary rulings under an abuse of discretion standard." *United States v. Green*, 873 F.3d 846, 854 (11th Cir. 2017).  "To the extent that the district court based its determination on an interpretation of the Federal Rules of Evidence, our review is *de novo*." *Id.*

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(c).  "Hearsay is inadmissible unless the statement is not hearsay as provided by Rule 801(d) or falls into one of the hearsay exceptions." *United States v. Caraballo*, 595 F.3d 1214, 1226 (11th Cir. 2010) (quotations omitted).  The state-of-mind hearsay exception provides that "[a] statement of the declarant's then-existing state of mind" is admissible.  Fed. R. Evid. 803(3).  For a statement to be admissible under this rule, however, the declarant's statement of mind must be relevant to an issue in the case.  *United States v. Jeri*, 869 F.3d 1247, 1261 (11th Cir. 2017).

We will reverse an erroneous evidentiary ruling only if the resulting error was not harmless. *Id.*  In other words, "[e]videntiary and other nonconstitutional errors do not constitute grounds for reversal unless there is a reasonable likelihood that they affected

the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." *United States v. Arbolaez*, 450 F.3d 1283, 1290 (11th Cir. 2006) (quotations omitted).

Even assuming arguendo that the district court erroneously admitted Haggard's statement, the error was harmless and does not merit reversal. As detailed previously, the evidence against Berry was significant. The jury heard recorded calls in which Berry solicited and planned drug transactions, and it heard corroborating testimony from some of his co-conspirators. Therefore, there is no reasonable likelihood that the admission of Haggard's lone statement—"that's not what it looked like"—had a substantial influence on the jury's verdict. Accordingly, Berry is not entitled to relief on this claim.

D. *Whether the district court erred in finding that Berry was ineligible for safety-valve relief at sentencing*

Berry argues that he met all of the criteria for eligibility under the safety-valve provision in 18 U.S.C. § 3553(f), and that he provided full disclosure of all he knew regarding the offenses in his two proffers to the government.

"When reviewing the denial of safety-valve relief, we review for clear error a district court's factual determinations. We review *de novo* the court's legal interpretation of the statutes and

sentencing guidelines." *United States v. Johnson*, 375 F.3d 1300, 1301 (11th Cir. 2004) (internal citation omitted).

The safety-valve provision provides that, for an offense under 21 U.S.C. 841, "the court shall impose a sentence pursuant to [the Guidelines] . . . without regard to any statutory minimum sentence, if the court finds at sentencing" that the defendant satisfies five criteria. *See* 18 U.S.C. § 3553(f). One criterion is that "not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." *Id.* § 3553(f)(5). This factor is known as the "'tell-*all*' provision: to meet its requirements, the defendant has an affirmative responsibility to truthfully disclose to the government all information and evidence that he has about the offense and all relevant conduct." *Johnson*, 375 F.3d at 1302 (quotations omitted). The defendant bears the burden to demonstrate by a preponderance of the evidence that he has met all the safety-valve criteria. *United States v. Carillo-Ayala*, 713 F.3d 82, 90 (11th Cir. 2013).

Here, the district court did not clearly err in concluding that Berry did not qualify for safety-valve relief. The government asserted that Berry had not truthfully provided all of the information he knew about the offenses to the government. Although Berry disputed this contention, he did not present any information that would have established by a preponderance of the

evidence that he in fact satisfied the tell-all provision.  Thus, he failed to meet his burden of establishing his eligibility for safety-valve relief.  *Id.* at 90.

### III.    Conclusion

Because Berry is not entitled to relief on any of his claims, we affirm his convictions and sentence.

**AFFIRMED.**