[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

**FILED**
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 23, 2004
THOMAS K. KAHN
CLERK

No. 03-14071
Non-Argument Calendar

_____

D. C. Docket No. 99-00850-CV-ORL-19KRS

JANE ROE, II,

Plaintiff-Appellant,

versus

AWARE WOMAN CENTER FOR CHOICE, INC.,
a Florida corporation,
EDWARD W. WINDLE, JR.,
PATRICIA BAIRD WINDLE,
WILLIAM P. EGHERMAN, M.D.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(January 23, 2004)**

Before BIRCH, DUBINA and CARNES, Circuit Judges.

PER CURIAM:

The plaintiff, who is proceeding anonymously under the name Jane Roe, II, suffered complications during the course of an abortion in March of 1997. Thereafter, she brought suit against the clinic, Aware Woman Center for Choice, Inc., the owners of the clinic, Patricia and Edward Windle, and the physician who attempted to perform the abortion, William Egherman. She did so pursuant to the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248. On this appeal, we consider the district court's grant of summary judgment in favor of the defendants. We affirm because the record is devoid of any evidence that the defendants had the statutorily-required motive necessary to violate FACE.

## I. Procedural History

This is not the first time that this case has been before this Court. Previously, the district court dismissed Roe's complaint under Fed. R. Civ. P. 12(b)(6) and denied her request to proceed anonymously. Roe appealed. We remanded in order to allow Roe to amend her complaint to state a claim under FACE and to proceed anonymously. Roe, II v. Aware Center for Choice, Inc., 253 F.3d 678 (11th Cir. 2001). As we will discuss in more detail shortly, we were explicit in our opinion about what Roe would be required to allege and prove in

2

order to successfully bring a claim under FACE. Id. at 680-83.

The case is now back before us for review of the district court's order granting summary judgment to the defendants and denying all other pending motions as moot.

## II. Facts

### A.

In early March 1997, Roe visited the clinic and signed a form indicating, among other things, that she understood the various risks involved in obtaining an abortion and that she consented to receiving medically necessary treatment in the event of complications. On March 29, 1997, she again signed the same form when she returned to the clinic in order to undergo what would be her fourth abortion.[1]

Before the procedure began, Roe became nervous because she thought women were being called into the surgery room rather quickly and because of her unexplained fears of both pain and punishment. Once in the surgery room, Dr. Egherman gave Roe nitrous oxide gas to help relax her. A patient advocate, whose job was to attend to Roe's emotional concerns, was in the room.

---

[1] Roe II states that this was Roe's third abortion, however the more developed record now before us makes clear that it was actually her fourth abortion. (Roe Dep. at 54-55, 62, 121.)

3

Dr. Egherman began the surgery by inserting a speculum, sterilizing Roe's cervix, applying a topical gel to reduce any pain associated with the lidocaine injections, and giving the lidocaine injections. He dilated Roe through the insertion of increasingly larger dilators and then began to use a canula which is connected to a vacuum aspirator and used to remove the fetus. Dr. Egherman recognized that the canula was struggling to remove tissue. He used his bear forceps in an attempt to remove the tissue, and at that point realized that something was wrong.

Dr. Egherman began to diagnosis the problem, determine whether there might be internal bleeding, assess whether hospitalization was necessary, and stabilize Roe for transfer to the hospital. An ambulance was called on his order, and he spoke to the emergency physician and OB/GYN on duty at the hospital. Dr. Egherman did not perform any more abortions that day because he was too shaken to do so. He went to the hospital to check on Roe, who had suffered a perforated uterus and a lacerated colon. Roe underwent surgery at the hospital to repair the damage and to remove the fetus.

B.

Throughout the entire procedure at the clinic, beginning with the insertion of the speculum, Roe complained of unusual discomfort and/or pain.

4

At some point, Roe ordered Dr. Egherman to stop and said that she wanted the clinic to call her mother and that she would drive herself to the hospital. The record is not clear as to when Roe ordered Dr. Egherman to stop. Roe's deposition suggests that Dr. Egherman began to perform the abortion and after he realized there was a problem continued some procedure on her. (Roe Dep. at 120-23; 140-41.) However, Roe's argument on appeal is that there was a time after she ordered him to stop and before he started treatment (diagnosis and stabilization) when he continued to attempt to perform the abortion.

Additionally, at some point Dr. Egherman ordered others in the room to hold Roe down. The record is unclear as to whether this was done while he was continuing to attempt to perform the abortion or when he was diagnosing the problem and stabilizing Roe for the ride to the hospital.

For reasons we will explain below, these factual disputes are not material.

### III. Summary Judgment Standard

The district court granted summary judgment for the defendants pursuant to Fed. R. Civ. P. 56. "We review de novo a summary judgment ruling, applying the same legal standard used by the district court." Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Pertinent here, the Supreme Court has explained that standard as follows:

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since <u>a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.</u>

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986) (emphasis added).

## IV. Discussion

### A.

In relevant part, FACE prohibits using force to injure, intimidate, or interfere with a woman because she has obtained, or to prevent her from obtaining, reproductive health services.[2]  18 U.S.C. § 248(a)(1).  The focus of Roe's first

---

[2] FACE provides:
(a) Prohibited activities.–Whoever–
(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services;

6

appeal was whether she had alleged that the defendants' actions were motivated by a desire to prevent her from obtaining reproductive health services. Roe II, 253 F.3d at 681. The dispositive issue now is whether there exists a material issue of fact as to the defendants' motive.

We begin by revisiting Roe II to understand FACE's motive requirement. Roe II noted that FACE specifically defines "reproductive health services" in a broad manner which includes "'medical, surgical, counseling, or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy.'" Id. at 681 (quoting 18 U.S.C. § 248(e)(5)). With this definition in mind, we concluded that:

> For purposes of FACE, it matters not whether the reason Roe wanted to leave the clinic immediately and go to a hospital emergency room was so that she could have the damage done to her uterus repaired, or because she had changed her mind and wanted to save the pregnancy, or because she wanted to have the abortion completed at a hospital instead of at the clinic. If the defendants restrained Roe for the purpose of preventing her from obtaining any of those services, then she has adequately pleaded a violation of FACE because all of those services fall within the statutory definition of "reproductive health

---

 . . . .
shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor.
18 U.S.C. § 248(a).

services.”

Id. at 682 (emphasis added). From there, we went on to explain that:

> The next question then is whether Roe's complaint can be construed as alleging that defendants, in restraining Roe, were motivated by a desire to prevent her from obtaining those services. Defendants contend that it is unreasonable to assume that they restrained Roe in order to prevent her from obtaining reproductive health services. They argue that if they did restrain Roe, the only reason they did so was to protect her life and health and prevent further injury from the complications that had arisen during the course of the abortion procedure. Roe concedes that if that were the defendants' motive, there was no violation of FACE.

Id. (emphasis added; footnote omitted). In a footnote, "[w]e agree[d] with [Roe's] concession that if the defendants' sole motive was to protect Roe's life or health [then] the defendants win" and went on to anticipate that summary judgment would be filed on remand. Id. at n.5.

## B.

Because the district court has now granted summary judgment for the defendants, we are called upon to determine whether there is a question of material fact as to the defendant's motive. Our review of the record indicates that there is not.

During discovery, only Roe, Dr. Egherman, and the Windles were deposed. The patient advocate, whose job was to focus on Roe's emotional needs and

concerns, was not deposed. Dr. Egherman's surgical assistant was not deposed. The various clinic personnel who entered the surgery room once Dr. Egherman determined there was a problem and began calling out for a sonogram machine and help were not deposed. And, of those who were deposed, the Windles were of no help to Roe in establishing motive because they were not even at the clinic when Dr. Egherman attempted to abort her fetus. That leaves only the depositions of Roe and Dr. Egherman to consider.

Turning first to Roe's deposition, it is clear that she can offer no admissible evidence, as distinguished from speculation, conjecture, and opinion, about what Dr. Egherman's motive was in ordering that she be restrained and continuing to treat her even after she had ordered him to stop. The following excerpts are typical of Roe's deposition:

> Q. Well, do you know whether he was holding you down or keeping you still or doing whatever he was doing for your own benefit to stabilize you?
> A. I don't think it was for my own benefit. It was because I raised my voice and told him that the pain that I was feeling was not pain that I had ever felt before and I said to let me go. And because of that, they kept me there . . . .
> Q. Do you think he was doing that for your own good?
> A. No.
> Q. Do you think he was doing it for your own safety?
> A. To go back in me again for my own safety?
> Q. To do everything he did?
> A. No. No.

9

Q. Well, why do you think he did it?

A. To go in and finish the procedure . . . .

. . . .

A. I don't think it was for my safety.

. . . .

Q. Let's assume hypothetically the doctor made a mistake. He did something wrong in this procedure and he needed to go back in and do what he did to make sure you wouldn't die. Okay?

A. Uh-huh.

Q. Do you think he should have gone back in and did what he did.

A. No.

Q. He should have let you die?

[objection]

A. No. He shouldn't have let me die, but he should have not gone back in. If he didn't go back in for what he was going in for, why would you go back in?

Q. What if he had to go back in just to save your life? He couldn't complete the abortion. He had done something terribly wrong. He needed to go back in for other reasons.

[objection]

[A.] I still don't think he should have went back in. What other reason would he have to go back in than to get the fetus?

. . . .

Q. Assuming he had to go in to stabilize you -- okay? To stabilize you. Assuming he had to do that. For a perfectly valid medical reason, he had to go in. Okay?

A. Uh-huh.

Q. Just assume that. I want you to assume he had to go back in.

A. Uh-huh.

Q. Do you agree with him going back in?

[objection]

[A.] No.

. . . .

Q. You still wouldn't have wanted him to go in?

A. No.

(Roe Dep. at 88-91.)

10

Although Roe assumes that Dr. Egherman's sole motivation was to continue the abortion, when asked point blank she admitted that she did not know what his motivation was. (Roe Dep. at 120) ( "Q. And you don't know why he went back in? A. No, I don't."). Roe offered no evidence that Dr. Egherman's motivation was to prevent her from obtaining reproductive health services.

In contrast, during his deposition Dr. Egherman explained that a doctor cannot obey a woman's demand that the abortion be stopped at just any time, because she might risk death if he did so. There is, according to his unrebutted testimony, "a point of no return." (Egherman Dep. at 160.) He also specifically testified that his interest was in protecting Roe's health and safety.

In response to a question from Roe's counsel about how Dr. Egherman determined that it was necessary to restrain a patient, he explained that a patient is restrained "if his or her actions to leave would jeopardize his or her health." Dr. Egherman was explicit that Roe's "attempt to leave would have put her life or her health in danger." He explained that Roe was "under the influence of nitrous oxide, fear, and pain" and thus was "not in her right mind to make a logical decision." He explained that "while she says she wanted me to stop, and she wanted to get out of there, I could not let her leave because that would have killed her. It was likely to have killed her. And my primary purpose is to protect and

11

safeguard her health." He further noted that he has let "numerous [other] patients leave if they wanted to leave." He concluded that he "would be negligent if I let her leave without making sure that her, you know, her health was stabilized and safeguarded." (Egherman Dep. at 190-92.)

Counsel for the Windles and the clinic then questioned Dr. Egherman during the deposition. The physician confirmed that he acted out of medical necessity and suggested that he had "breached that point of no return" before Roe ordered him to stop. (Egherman Dep. at 194-95.) Dr. Egherman was asked: "At any point in time, were your actions done to prevent her from going to a hospital, or -- or getting an ambulance, or seeking any other reproductive health care services?" (Egherman Dep. at 195.) Dr. Egherman's response was: "Oh, I never, never prevented her from seeking any reproductive healthcare services, that was never the issue." (Egherman Dep. at 196.) Dr. Egherman wanted Roe to go to the hospital and had the ambulance called for her. He also spoke to the emergency room physician and the OB/GYN so they would be prepared "to take care of my patient." (Egherman Dep. at 196.) Dr. Egherman confirmed that the "only reason" that he ordered that Roe be restrained was to protect her health and safety. (Egherman Dep. at 197.)

In light of this record, there is no material issue of fact as to whether Dr.

12

Egherman was motivated by a desire to prevent Roe from obtaining reproductive health services, as required by FACE and explained in Roe II, see supra. Roe previously conceded, and we agreed, that if his motivation was to protect her life and safety, then she could not successfully prove a violation of FACE. Roe II, 253 F.3d at 682 & n.5. Because there is no genuine issue of material fact disputing Dr. Egherman's position that his motivation was to protect Roe's health and safety, the district court's grant of summary judgment in the defendants' favor was appropriate.

## C.

One last argument merits discussion. Roe contends that the defendants attempted to perform a forced abortion on her and given that fact, as a matter of law, the only possible motivation that the defendants could have had was to violate FACE. She cites no authority for this argument, but explains that because the effect of the defendants' actions would have been to end her pregnancy, she would be unable to obtain reproductive health services elsewhere. Roe's theory is unsound because it confuses motive with effect. While continuing an abortion after a patient wishes it to stop does have the effect of preventing that patient from obtaining reproductive health services elsewhere, that is merely a side-effect when the abortionist is motivated by a desire to protect the health and safety of the

13

mother because the procedure has progressed too far to stop or complications have arisen that require continuing it.  FACE is only violated when the motivation requirement is met.  <u>Roe II</u>, 253 F.3d at 680-81.  Here it was not.

## V.  Conclusion

We AFFIRM the district court's grant of summary judgment to the defendants and, after careful review, we conclude that Roe's other issues on appeal are meritless.[3]

---

[3] Roe's other arguments and issues do not warrant discussion.