[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10367

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

_versus_

ALEXANDER RAFAEL SANTOS-SANTANA,
PAULINO VASQUEZ-RIJO,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20384-BB-2

_____

Before Newsom, Grant, and Lagoa, Circuit Judges.

PER CURIAM:

In this consolidated appeal, Alexander Santos-Santana and Paulino Vasquez-Rijo (collectively, "Defendants") challenge their convictions and sentences of 120 months' imprisonment for conspiracy to possess cocaine while on board a vessel subject to the jurisdiction of the United States. On appeal, Defendants make several arguments.

First, they argue that 46 U.S.C. § 70502(d)(1)(C) of the Maritime Drug Law Enforcement Act ("MDLEA") is facially invalid under the Felonies Clause, U.S. Const. art. I, § 8, cl. 10, because the MDLEA expands jurisdiction to vessels that make a verbal claim of nationality without any corroboration by the named nation. They contend that, under customary international law, a verbal claim of nationality without corroboration constitutes proof of the vessel's nationality, and that the Felonies Clause should be read in conjunction with customary international law because the clause contains international law terms. Santos-Santana also asks us to adopt the First Circuit's decision in *United States v. Davila-Reyes*, 23 F.4th 153 (1st Cir. 2022), *reh'g en banc granted, op. withdrawn*, 38 F.4th 288 (1st Cir. 2022), which held that Congress exceeded its power by defining a "vessel without nationality" to include vessels for which the crew claimed a nationality but the nation neither confirmed nor denied. They also argue that the MDLEA is

unconstitutional as applied to them because the vessel was in the Dominican Republic's Exclusive Economic Zone ("EEZ"), which customary international law excludes from the high seas.

Second, Defendants contend that the district court clearly erred in determining that they did not qualify for safety-valve relief. While the United States Coast Guard ("USCG") found a firearm on board the boat Defendants were on, Defendants argue that there was no evidence that they possessed that firearm, as the firearm was found in a plastic bag underneath an unused engine in the rear of the boat and unloaded with no ammunition present on the boat. They argue that the district court applied the incorrect standard because it confused the safety valve with the firearm enhancement, pursuant to U.S.S.G. § 2D1.1. Third, Santos-Santana argues that the district court clearly erred in determining that he did not qualify for a minor-role reduction because he testified that Vasquez-Rijo had greater responsibility on the vessel than he did.

For the reasons discussed below, we affirm.

## I.    BACKGROUND

### A.  Factual Background Common to Both Defendants

In 2021, a federal grand jury charged Defendants each with one count of conspiracy to possess a controlled substance aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. § 70506(b) (Count One), and one count of possession with intent to distribute a controlled substance aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C.

§ 70506(a)(1) (Count Two). Both Defendants pleaded guilty, without a plea agreement, to Count One, with the understanding that the government would move to dismiss Count Two at the time of sentencing.

According to the stipulated factual proffers each signed by Defendants, on July 5, 2021, "a maritime patrol aircraft (MPA) detected a go-fast vessel (GFV) approximately 80 miles southwest of Mona Island, Puerto Rico, in international waters and upon the high seas." The MPA observed two people and multiple packages on board the GFV with no flag or any other indicia of nationality. The USCG arrived on the scene and found Defendants on board the GFV. While neither identified themselves as the master of the GFV, Vasquez-Rijo made a verbal claim of Dominican nationality for the vessel. USCG contacted the Dominican Republic's government, which could neither confirm nor deny the nationality of the GFV. The USCG boarding team recovered 12 bales consisting of approximately 357 kilograms of cocaine, and a shotgun. The parties stipulated that the vessel "was a vessel without nationality" and subject to United States jurisdiction, pursuant to 46 U.S.C. § 70502(c).

At the change of plea hearing, both Defendants were sworn. In relevant part, the government summarized the factual basis as it appeared in the stipulated factual proffers, and both Defendants admitted to the facts as detailed. The district court found that the United States had jurisdiction over the vessel as a vessel without

nationality, pursuant to § 70502(c).  And the district court accepted each Defendant's plea of guilty.

The U.S. Probation Office generated both Defendants' individual presentence investigation reports ("PSI"), describing the offense conduct with the stipulated factual proffer.  Each PSI further provided that the firearm found onboard was unloaded and no ammunition was located on the GFV.  The PSIs stated that neither Defendant qualified for an aggravating or mitigating role adjustment because the evidence did not suggest that one of the conspirators was the captain or navigator of the vessel.  The PSIs also stated that neither Defendant qualified for safety-valve relief under U.S.S.G. § 5C1.2 because they possessed a firearm in connection with the offense.

Pursuant to U.S.S.G. § 2D1.1, their base offense level was 36 because the offense involved at least 150 kilograms but less than 450 kilograms of cocaine.  Pursuant to § 2D1.1(b)(1), they each received a two-level increase because there was a firearm aboard the vessel.  Pursuant to U.S.S.G. § 3E1.1(a) and (b), they each received a total 3-level reduction for their acceptance of responsibility, resulting in a total offense level of 35.  They each were assigned zero criminal history points, resulting in a criminal history category of I.  Santos-Santana's PSI noted that Santos-Santana had been employed as a boat driver.  The statutory maximum term of imprisonment for each was life imprisonment, and the minimum term was ten years.  Based on their total offense level of 35 and criminal

history category of I, each of their guideline ranges was 168 to 210 months' imprisonment.

Santos-Santana objected to the two-level increase for possession of a firearm because there was no evidence that the firearm was used to commit the crime, no ammunition on the boat, and no evidence that he possessed the firearm or intended to possess the firearm. He objected that he should have received a two-level minor-role reduction to his offense level, arguing that his role compared to Vasquez-Rijo's was minor because the evidence showed that he (1) did not obtain the boat; (2) did not have relationships with anyone in Colombia related to the conspiracy; (3) had no connection to the firearm; and (4) received instructions from Vasquez-Rijo as to his role in the conspiracy. He contended that Vasquez-Rijo's conduct included planning and organizing the conspiracy while his conduct included accompanying Vasquez-Rijo. He also objected that he should have received safety-valve relief, pursuant to U.S.S.G. § 5C1.2, despite the unloaded firearm found on the boat. He argued that constructive possession was insufficient to preclude safety-valve relief and that there was no evidence that he actually possessed the firearm in connection with the offense.

Vasquez-Rijo objected to the two-level increase pursuant to § 2D1.1(b)(1) because the firearm was unloaded, no ammunition was recovered aboard the vessel, and he did not claim ownership of the gun. He also argued that he should have received safety-valve relief, pursuant to § 5C1.2, because he did not actually possess the firearm, as it was found in a black plastic bag underneath an

engine on the vessel, and because there was no evidence that he induced anyone to possess the firearm.

The government responded that the two-level increase was proper because the firearm was present on the vessel and neither Defendant had shown that the connection between the firearm and the offense was clearly improbable.  The government contended that Defendants' constructive possession of the firearm was sufficient to preclude safety-valve relief.  The government argued that the firearm was connected to the offense because the vessel was small and contained both the firearm and the cocaine.  The government also argued that Santos-Santana did not qualify for a minor-role reduction because the record did not support his claims about his role in the conspiracy; the conduct he was being held accountable for was attempting to smuggle 357 kilograms of cocaine through a vessel, for which his and Vasquez-Rijo's roles were the same.

## B.  Vasquez-Rijo's Sentencing Hearing

At Vasquez-Rijo's sentencing hearing, the district court confirmed that both the government and Vasquez-Rijo agreed that the firearm was found in a black plastic trash bag underneath the secondary engine near the rear of the vessel.  The district court asked the government where the firearm was in relation to the drugs, to which the government answered that the drugs, firearm, fuel drums, and spare engine were scattered and distributed throughout "a very small area of the boat," which was thirty-feet long with

approximately twenty-feet of length constituting the vessel's interior.

As to his objections, Vasquez-Rijo argued that there was no evidence that he owned or brought the firearm on board the vessel nor evidence of who initially possessed the firearm, who brought the firearm on board, or the condition of the firearm when it was placed on the vessel. He argued that the firearm was unloaded, that he lacked access to ammunition, and that the firearm was not easily accessible because it was wrapped in a bag underneath an engine. He reiterated there was no evidence that he possessed the firearm or evidence to link the possession of the firearm to anyone involved in the instant offense conduct. As to safety-valve relief, he argued that he did not actually possess the firearm and that there was a difference between his two objections, i.e., the lower burden for safety-valve relief and the fact that a defendant may receive the firearm enhancement while still being eligible for safety-valve relief. In response, the government argued that: it had satisfied its burden to show a firearm was present because it was undisputed a firearm was found on the vessel; Vasquez-Rijo failed to establish that it was not connected to drugs; and he was not eligible for safety-valve relief because he physically and constructively possessed the firearm by having dominion and control over the area of the vehicle in which it was found, given that there were only two people aboard the vessel.

The district court found the government satisfied its burden pursuant to § 2D1.1(b)(1) in showing that the firearm was present.

While considering the fact that the firearm was unloaded and within a plastic bag, the district court noted that it was close in proximity to the drugs because it was in a small, 30-foot vessel and underneath an unconnected motor within the belly of the vessel, The district court concluded that "to find that the connection is clearly improbable would be to ignore the facts in this case." The district court overruled the objections, finding that the government met its burden by the greater weight of the evidence of proving the firearm enhancement applied. After confirming there were no further objections, the district court found that, with a total offense level of 35 and a criminal history category of I, Vasquez-Rijo's total Guideline range was 168 to 210 months' imprisonment. The district court imposed the mandatory minimum sentence of 120 months' imprisonment, followed by 5 years of supervised release. And the government moved to dismiss Count Two, which the district court granted.

### C.  Santos-Santana's Sentencing Hearing

As to Santos-Santana, he testified to the following at his sentencing hearing. Vasquez-Rijo was involved in organizing the drug trip and obtaining the vessel, not Santos-Santana. Vasquez-Rijo had prior relationships with the individuals in Colombia because he had made two previous trips to Colombia for drugs, and he managed and supervised Santos-Santana on the trip. Vasquez-Rijo owned the firearm and never disclosed its purpose, and Santos-Santana never touched it. The firearm was never displayed or used

during the offense conduct, and Santos-Santana did not try to induce Vasquez-Rijo into using or bringing it.

On cross-examination, Santos testified to the following. He first met Vasquez-Rijo when getting on the boat and only found out they were transporting cocaine, and not marijuana, when the drugs were placed on the vessel in Colombia. He worked before on boats as a sailor, acting as an aid to the captain, but did not have sufficient experience to drive a boat from the Dominican Republic to Colombia. He, however, drove the vessel at times during the offense conduct; but he did not drive the boat after it left Colombia. His role was to provide gasoline to the engines, hold the GPS, and look out for law enforcement.

As to minor-role reduction, Santos-Santana argued that the relevant conduct for sentencing was transporting the cocaine because he was not involved in acquiring the vessel, did not having any relationships with regards to organizing and executing the trip, and had no connection to the firearm found on the vessel, unlike Vasquez-Rijo. He contended that Vasquez-Rijo had a better understanding of the scope and structure of the criminal activity, participated in the planning or organizing of the criminal activity, and exercised decision-making authority as captain of the vessel. As to safety-valve relief, he asserted that the firearm was not connected to the offense because he testified that he was not involved with the firearm. He contended that nothing in the record about his own conduct established possession of the firearm. And he

informed the court he would not argue against § 2D1.1(b)(1) enhancement.

The government largely adopted the arguments it made in Vasquez-Rijo's sentencing hearing. It also argued that Santos-Santana was not credible and that he knew the purpose of the voyage, willingly participated in it, and knew of the existence of the firearm. The government argued he constructively possessed the firearm, noting that he was an experienced mariner, knew the conduct was illegal by looking out for law enforcement, and helped operate the GPS. And the government contended there was no distinction between him and his codefendant because they were both equally culpable.

As to the minor-role reduction, the district court found that Santos-Santana did not meet his burden and overruled his objection. The district court found that, based on the testimony, Vasquez-Rijo did not supervise the drug trip; rather, Defendants were coequal participants regarding the conspiracy, despite the fact they played different roles at times. The district court noted Santos-Santana testified that they were a team and that he was aware of the firearm before boarding the vessel and was aware there were drugs.

As to safety-valve relief, the district court found that the firearm, even though unloaded and in a bag, was in close proximity to the drugs, as it was inside the small vessel. The district court further found that the firearm was within Santos-Santana's dominion and control during the offense conduct. As to the relevant conduct,

the district court explained that he was on the vessel for a long period of time, operated the vessel, served as the lookout, operated the GPS at night, and was aware of the amount of drugs on board. Thus, the district court overruled his objection because Santos-Santana had not met his burden to prove that the firearm was not possessed in connection with the offense.

The district court found that, with a total offense level of 35 and a criminal history category of I, Santos-Santana's total Guideline range was 168 to 210 months' imprisonment. The district court imposed the mandatory minimum sentence of 120 months' imprisonment, followed by 5 years of supervised release. The government filed a motion to dismiss Count Two, which the district court granted.

★ ★ ★ ★

This consolidated appeal ensued.

## II.    ANALYSIS

Our analysis is divided into three parts. First, we address Defendants' arguments about the MDLEA. Second, we address Defendants' safety-valve relief arguments. Last, we address Santos-Santana's minor-role reduction arguments.

## A. MDLEA

A district court's subject-matter jurisdiction "is a question of law that we review *de novo* even when it is raised for the first time on appeal." *United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir.

2016). We review for clear error the district court's factual findings relevant to jurisdiction. *Id.* While parties may not stipulate to jurisdiction, they may "stipulate to *facts* that bear on our jurisdictional inquiry." *Id.* at 1337 (emphasis in original) (quoting *Eng'g Contractors Ass'n of S. Fla. v. Metro Dade County*, 122 F.3d 895, 905 (11h Cir. 1997)). Further, arguments as to subject matter jurisdiction may not be waived. *United States v. De La Garza*, 516 F.3d 1266, 1271 (11th Cir. 2008).

Likewise, we review *de novo* the constitutionality of a criminal statute. *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010). Although a guilty plea generally waives a defendant's right to appeal his conviction, it does not waive the right to challenge the constitutionality of the statute underlying the conviction. *See Class v. United States*, 138 S. Ct. 798, 803 (2018). But when a nonjurisdictional constitutional challenge is raised for the first time on appeal, our review is only for plain error. *Wright*, 607 F.3d at 715; *United States v. Vereen*, 920 F.3d 1300, 1312 (11th Cir. 2019). Plain error occurs when "(1) there was error, (2) that was plain, (3) that affected the defendant's substantial rights, and (4) that seriously affected the 'fairness, integrity, or public reputation of judicial proceedings.'" *Wright*, 607 F.3d at 715 (quoting *United States v. Jones*, 289 F.3d 1260, 1265 (11th Cir. 2002)). "When neither this Court nor the Supreme Court have resolved an issue, there can be no plain error in regard to that issue." *Vereen*, 920 F.3d at 1312.

Under our prior-panel-precedent rule, "a prior panel's holding is binding on all subsequent panels unless and until it is

overruled or undermined to the point of abrogation by the Supreme Court or by [us] sitting *en banc*." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008). "[A] prior panel precedent cannot be circumvented or ignored on the basis of arguments not made to or considered by the prior panel." *In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015) (quoting *Tippitt v. Reliance Standard Life Ins. Co.*, 357 F.3d 1227, 1234 (11th Cir. 2006)). However, we are bound only by explicit jurisdictional holdings, and where a jurisdictional issue was not presented and explicitly addressed by the prior precedent, we will not be bound by a prior implicit jurisdictional holding. *In re Bradford*, 830 F.3d 1273, 1278 (11th Cir. 2016).

Article I of the Constitution empowers Congress "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. This Clause contains three distinct grants of power: (1) "the power to define and punish piracies"; (2) "the power to define and punish felonies committed on the high seas"; and (3) "the power to define and punish offenses against the law of nations." *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1248 (11th Cir. 2012). The Felonies Clause represents the second of the three grants of power. *See id.*

Pursuant to the Felonies Clause, Congress enacted the MDLEA to prohibit knowing and intentional possession with intent to distribute a controlled substance onboard a vessel subject to the jurisdiction of the United States. *United States v. Campbell*,

743 F.3d 802, 805 (11th Cir. 2014); 46 U.S.C. § 70503(a)(1). The MDLEA describes several circumstances in which a vessel is subject to the jurisdiction of the United States, including when it is "a vessel without nationality." 46 U.S.C. § 70502(c)(1)(A), (C). A vessel without nationality includes "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." *Id.* § 70502(d)(1)(C). A claim of nationality or registry may be made, in relevant part, by "a verbal claim of nationality or registry by the master or individual in charge of the vessel." *Id.* § 70502(e). "[W]hether a vessel is subject to the jurisdiction of the United States is not an element of [an MDLEA] offense, but instead is solely an issue of subject matter jurisdiction that should be treated as a preliminary question of law for the court's determination." *United States v. Tinoco*, 304 F.3d 1088, 1105 (11th Cir. 2002); *accord Campbell*, 743 F.3d at 805. We have construed the "'on board a vessel subject to the jurisdiction of the United States' portion of the MDLEA as a congressionally imposed limit on courts' subject-matter jurisdiction." *De La Garza*, 516 F.3d at 1271. The government must show that the statutory requirements of MDLEA subject-matter jurisdiction are met. *Tinoco*, 304 F.3d at 1114.

A person charged with a violation of the MDLEA "does not have standing to raise a claim of failure to comply with international law as a basis for a defense." 46 U.S.C. § 70505; *accord United States v. Hernandez*, 864 F.3d 1292, 1301 (11th Cir. 2017). Such a

claim "may be made only by a foreign nation" and "does not divest a court of jurisdiction." § 70505. Accordingly, "any battle over the United States' compliance with international law in obtaining MDLEA jurisdiction should be resolved nation-to-nation in the international arena, not between criminal defendants and the United States in the U.S. criminal justice system." *Hernandez*, 864 F.3d at 1302.

We have held that Congress did not exceed its power under the Felonies Clause in enacting the MDLEA. *Id.* at 1303 (holding that the argument that the MDLEA was unconstitutional under the Felonies Clause as to stateless vessels on the high seas without a proven nexus to the United States was foreclosed by precedent); *Campbell*, 743 F.3d at 810–12 (holding that the MDLEA was constitutional under the Felonies Clause as to stateless vessels lacking any nexus to the United States and committing drug trafficking offenses); *United States v. Estupinan*, 453 F.3d 1336, 1338–39 (11th Cir. 2006) (holding that the MDLEA was constitutional under the Felonies Clause to punish drug trafficking). Notably, "[w]e have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause." *Campbell*, 743 F.3d at 810 (quoting *Bellaizac-Hurtado*, 700 F.3d at 1257). Congress "may assert extraterritorial jurisdiction over vessels in the high seas that are engaged in conduct that 'has a potentially adverse effect and is generally recognized as a crime by nations that have reasonably developed legal systems.'" *Id.* (quoting *Tinoco*, 304 F.3d at 1108). Moreover, because narcotics trafficking

is condemned universally by law-abiding nations, there is "no reason to conclude that it is 'fundamentally unfair' for Congress to provide for the punishment of persons apprehended with narcotics on the high seas." *Estupinan*, 453 F.3d at 1339 (quoting *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d. Cir. 1993)).

"Prior to giving extraterritorial effect to a penal statute, we consider whether doing so would violate general principles of international law." *United States v. MacAllister*, 160 F.3d 1304, 1308 (11th Cir. 1998). The law of nations permits the exercise of criminal jurisdiction by a nation, in relevant part, under the "protective" principle. *Id.* at 1308 n.9. The protective principle permits the United States to assert jurisdiction over a person whose conduct outside the country threatens its security or the operation of its governmental functions. *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1379 n.5 (11th Cir. 2011). We held in *Campbell* that "the conduct proscribed by the [MDLEA] need not have a nexus to the United States because universal and protective principles support its extraterritorial reach." *Campbell*, 743 F.3d at 810; *see also United States v. Cruickshank*, 837 F.3d 1182, 1188 (11th Cir. 2016) (holding that the lack of a nexus requirement does not render the MDLEA unconstitutional).

We have held that the MDLEA is constitutional as applied to vessels on the high seas under the Piracies and Felonies Clause. *United States v. Cabezas-Montano*, 949 F.3d 567, 587 (11th Cir. 2020). That said, Congress lacks the power to proscribe drug trafficking in the territorial waters of another state. *United States v.*

*Bellaizac-Hurtado*, 700 F.3d 1245, 1258 (11th Cir. 2012). The United Nations Convention on the Law of the Sea provides that "[e]very State has the right to establish the breadth of its territorial sea up to a limit not exceeding 12 nautical miles." 21 I.L.M. 1245, 1272, pt. II, § 2, art. 3. Accordingly, the United States "generally recognizes the territorial seas of foreign nations up to twelve nautical miles adjacent to recognized foreign coasts." *United States v. McPhee*, 336 F.3d 1269, 1273 (11th Cir. 2003).

According to regulations, the territorial sea extends up to 12 nautical miles adjacent to the coast of a nation for territorial jurisdiction purposes. 33 C.F.R. § 2.22. The territorial sea baseline is the line defining the shoreward extent of the territorial sea of a nation. *Id.* § 2.20. For territorial jurisdiction purposes, high seas refer to "all waters seaward of the territorial sea baseline." *Id.* § 2.32(a). Under customary international law, high seas refer to all waters that are not included in the EEZ, territorial sea, or internal water of a nation. *Id.* § 2.32(d).

Here, because Defendants failed to raise the constitutional argument before the district court, plain-error review is appropriate. Because there is no binding precedent from us or the Supreme Court that directly addresses the specific issue of whether § 70502(d)(1)(C) is constitutional under the Felonies Clause, Santos-Santana and Vasquez-Rijo cannot show that any error was plain. Likewise, even if we deem their argument relates to the district court's subject-matter jurisdiction and review it *de novo*, it still fails, as we have consistently found that the MDLEA is a

permissible exercise of congressional power under the Felonies Clause. *See, e.g., Hernandez*, 864 F.3d at 1303; *Campbell*, 743 F.3d at 810–12; *Estupinan*, 453 F.3d at 1338. And we decline to adopt the holding of the First Circuit's now-withdrawn opinion in *Davila-Reyes* given our precedent concluding that other provisions of the MDLEA are constitutional under the Felonies Clause.

Defendants also cannot show that § 70502(d)(1)(C) was unconstitutional as applied to them. While they argue that they are not subject to jurisdiction under the stipulated facts, jurisdiction was proper because the USCG located their vessel in the high seas. While they argue that the EEZ is excluded from the high seas, regulations provide that the territorial definition of the high seas includes all waters seaward of the territorial sea baseline, which can extend no farther than twelve nautical miles adjacent to the coast of a nation. Further, prior panel precedent compels us to hold that their vessel was in the high seas, as it was not within the twelve nautical miles of a nation's coast. *See Cabezas-Montano*, 949 F.3d at 587; *McPhee*, 336 F.3d at 1273; *Archer*, 531 F.3d at 1352. Accordingly, we affirm as to this issue.

## B. Safety-Valve Relief

We review a district court's factual findings and subsequent denial of safety-valve relief for clear error. *United States v. Cruz*, 106 F.3d 1553, 1557 (11th Cir. 1997).

The safety-valve provisions of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2(a) enable a district court to disregard the statutory

minimum sentence if five requirements are met.  Relevant here, the second requirement for safety-valve relief is that the defendant did not possess a gun "in connection with the offense."  18 U.S.C. § 3553(f)(2); U.S.S.G. § 5C1.2(a)(2).  The defendant has the burden of showing that he meets the factors for relief by a preponderance of the evidence, including it is more likely than not that he did not possess a firearm in connection with the offense.  *United States v. Carillo-Ayala*, 713 F.3d 82, 90 (11th Cir. 2013).  The term "defendant," as used in § 5C1.2(a)(2), "limits the accountability of the defendant to his own conduct and conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused."  U.S.S.G. § 5C1.2 cmt. n.4.

"Our cases interpreting guidelines that require a 'connection' have consistently recognized that a firearm which facilitates or has the potential to facilitate an offense is possessed 'in connection with' that offense."  *Carillo-Ayala*, 713 F.3d at 93.  Additionally, in considering the safety-valve, we have held that "[a] firearm found in close proximity to drugs or drug-related items simply '*has*'—without any requirement for additional evidence—the potential to facilitate the drug offense."  *Id.* at 92 (emphasis in original).  We explained that "[a] defendant seeking relief under the safety valve, despite his possession of a weapon found in proximity to drug-related items, will have a difficult task in showing that, even so, there is no connection with the drug offense so the safety valve applies."  *Id.*  We also explained that:

> [w]hile other facts, such as whether the firearm is loaded, or inside a locked container, might be relevant to negate a connection, there is a strong presumption that a defendant aware of the weapon's presence will think of using it if his illegal activities are threatened. The firearm's *potential* use is critical. The Sentencing Commission gives special status to guns found in proximity to drugs.

*Id.* (emphasis in original). A firearm can facilitate a drug offense by emboldening the defendant who could display or discharge the weapon. *Id.* at 96.

The Guidelines provide for a two-level increase if the defendant is convicted of a crime involving drug trafficking and "'a dangerous weapon (including a firearm) was possessed' in connection with" that offense. *United States v. Delgado*, 981 F.3d 889, 902 (11th Cir. 2020) (quoting U.S.S.G. § 2D1.1(b)(1)). The enhancement applies if the government shows by a preponderance of the evidence that "the weapon was present, unless it is clearly improbable that the weapon was connected to the offense." U.S.S.G. § 2D1.1(b)(1) cmt. n.11(A); *accord United States v. Hall*, 46 F.3d 62, 63–64 (11th Cir. 1995).

"[N]ot all defendants who receive the enhancement under § 2D1.1(b)(1) are precluded from" safety-valve relief. *Carillo-Ayala*, 713 F.3d at 91. If the enhancement applies but the defendant also seeks safety-valve relief, "the district court must determine whether the facts of the case show that a 'connection' between the

firearm and the offense, though possible, is not probable." *Id.* "The number of defendants who meet both guidelines will undoubtedly be rare." *Id.* This determination is "consistent with Congress's intention that the safety valve [would] apply only to a 'narrow class of defendants, those who are the least culpable participants in such offenses.'" *Id.*

As an initial matter, the district court did not apply the wrong standard when determining whether the firearm barred safety-valve relief because the court articulated the correct burden. The district court did not clearly err in finding that Santos-Santana and Vasquez-Rijo did not qualify for the safety valve because the appellants failed to show that the firearm was not connected to the offense. The record shows that the firearm was found in close proximity to the drugs because the vessel that held the firearm and the drugs was small and confined, as depicted in the photograph submitted by the government. We therefore affirm as to this issue.

### C. Minor-Role Reduction

We review the district court's determination of a defendant's role for clear error. *United States v. Rodriguez De Varon*, 175 F.3d 930, 937 (11th Cir. 1999) (en banc). "[T]he district court has considerable discretion in making this fact-intensive determination." *United States v. Boyd*, 291 F.3d 1274, 1277–78 (11th Cir. 2002). As long as the "court's decision is supported by the record and does not involve a misapplication of law," the "'choice between two permissible views of the evidence' as to the defendant's role in the offense will rarely constitute clear error." *Cruickshank*,

837 F.3d at 1192 (quoting *Rodriguez De Varon*, 175 F.3d at 945). Any potential sentencing error that the district court may have committed is harmless when the defendant received the statutory minimum sentence. *United States v. Tigua*, 963 F.3d 1138, 1144 (11th Cir. 2020).

U.S.S.G. § 3B1.2 directs the sentencing court to decrease a defendant's offense level by two levels "[i]f the defendant was a minor participant in any criminal activity." A minor participant is one "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *Id.* § 3B1.2 cmt. n.5. In determining whether to apply an adjustment, courts consider the totality of the circumstances and the following non-exhaustive list of factors:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity.

*Id.* § 3B1.2 cmt. n.3(C). The defendant has the burden of proving his minor role in the offense by a preponderance of the evidence. *Rodriguez De Varon*, 175 F.3d at 939. Determining whether a defendant played a minor role in the offense is a fact-intensive inquiry "where no one factor 'is more important than another.'" *Cruickshank*, 837 F.3d at 1195 (quoting *Rodriguez De Varon*, 175 F.3d at 945). "[A] district court is not required to make any specific findings other than the ultimate determination of the defendant's role in the offense." *De Varon*, 175 F.3d at 940.

Additionally, the district court must consider: (1) the defendant's role in the relevant conduct for which he has been held accountable at sentencing; and (2) his role compared to that of the other participants in his relevant conduct. *Cruickshank*, 837 F.3d at 1192. "[W]here the relevant conduct attributed to a defendant is identical to [his] actual conduct," he cannot prove that he is "entitled to a minor role adjustment simply by pointing to some broader criminal scheme" in which he "was a minor participant but for which [he] was not held accountable." *Rodriguez De Varon*, 175 F.3d at 941. In determining the defendant's role compared to that of other participants, it is only those participants who were involved in the relevant conduct attributed to the defendant who are relevant to this inquiry. *United States v. Martin*, 803 F.3d 581, 591 (11th Cir. 2015). "Even if a defendant played a lesser role than the other participants, that fact does not entitle [him] to a role

reduction 'since it is possible that none are minor or minimal participants.'" *Id.* (quoting *United States v. Stanley*, 739 F.3d 633, 654 (11th Cir. 2014)).

The district court did not clearly err in declining to apply the minor-role reduction because Santos-Santana was not a minor participant in the conspiracy to possess cocaine on a vessel, as he and Vasquez-Rijo knowingly participated in the transportation of a large quantity of cocaine on a vessel and were important to that scheme. And, in any event, any potential sentencing error as to the minor-role reduction here was harmless, as Santos-Santana received the statutory minimum sentence. *See Tigua*, 963 F.3d at 1144.

## III.    CONCLUSION

For all these reasons, we affirm both Defendants' sentences.

**AFFIRMED.**